# CHENEY, VICE PRESIDENT OF THE UNITED STATES, ET AL. *v.* UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ET AL.

No. 03–475.  Argued April 27, 2004—Decided June 24, 2004

368

370

*Solicitor General Olson* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Keisler, Deputy Solicitor General Clement, Deputy Assistant Attorneys General Katsas* and *Coffin,* and *Mark B. Stern, Michael S. Raab,* and *Douglas Hallward-Driemeier.*

*Alan B. Morrison* argued the cause for respondent Sierra Club. With him on the brief were *Scott Nelson, David Bookbinder, Patrick Gallagher, Alex Levinson,* and *Sanjay Narayan. Paul J. Orfanedes* argued the cause for respondent Judicial Watch, Inc. With him on the brief was *James F. Peterson.*\*

JUSTICE KENNEDY delivered the opinion of the Court.

The United States District Court for the District of Columbia entered discovery orders directing the Vice President and other senior officials in the Executive Branch to produce information about a task force established to give advice and make policy recommendations to the President. This case requires us to consider the circumstances under which a court of appeals may exercise its power to issue a writ of mandamus to modify or dissolve the orders when, by virtue of their overbreadth, enforcement might interfere with the

---

\*Briefs of *amici curiae* urging affirmance were filed for the American Association of Law Libraries et al. by *David Overlock Stewart, Thomas M. Susman, Miriam M. Nisbet, Mark David Agrast, Meredith Fuchs,* and *Elliot M. Mincberg;* for Natural Resources Defense Council by *Eric ·R. Glitzenstein, Howard M. Crystal,* and *Sharon Buccino;* and for The Reporters Committee for Freedom of the Press et al. by *Lucy A. Dalglish, Richard M. Schmidt, Jr.,* and *Bruce W. Sanford.*

officials in the discharge of their duties and impinge upon the President's constitutional prerogatives.

## I

A few days after assuming office, President George W. Bush issued a memorandum establishing the National Energy Policy Development Group (NEPDG or Group). The Group was directed to "develo[p] . . . a national energy policy designed to help the private sector, and government at all levels, promote dependable, affordable, and environmentally sound production and distribution of energy for the future." App. 156–157. The President assigned a number of agency heads and assistants—all employees of the Federal Government—to serve as members of the committee. He authorized the Vice President, as chairman of the Group, to invite "other officers of the Federal Government" to participate "as appropriate." *Id.*, at 157. Five months later, the NEPDG issued a final report and, according to the Government, terminated all operations.

Following publication of the report, respondents Judicial Watch, Inc., and the Sierra Club filed these separate actions, which were later consolidated in the District Court. Respondents alleged the NEPDG had failed to comply with the procedural and disclosure requirements of the Federal Advisory Committee Act (FACA or Act), 5 U. S. C. App. § 2, p. 1.

FACA was enacted to monitor the "numerous committees, boards, commissions, councils, and similar groups [that] have been established to advise officers and agencies in the executive branch of the Federal Government," § 2(a), and to prevent the "wasteful expenditure of public funds" that may result from their proliferation, *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 453 (1989). Subject to specific exemptions, FACA imposes a variety of open-meeting and disclosure requirements on groups that meet the definition of an "advisory committee." As relevant here, an "advisory committee" means

"any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . , which is—

.      .      .      .      .

"(B) established or utilized by the President, . . . except that [the definition] excludes (i) any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government . . . ." 5 U. S. C. App. § 3(2), p. 2.

Respondents do not dispute the President appointed only Federal Government officials to the NEPDG. They agree that the NEPDG, as established by the President in his memorandum, was "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." *Ibid.* The complaint alleges, however, that "nonfederal employees," including "private lobbyists," "regularly attended and fully participated in non-public meetings." App. 21 (Judicial Watch Complaint ¶ 25). Relying on *Association of American Physicians & Surgeons, Inc.* v. *Clinton,* 997 F. 2d 898 (CADC 1993) *(AAPS),* respondents contend that the regular participation of the non-Government individuals made them *de facto* members of the committee. According to the complaint, their "involvement and role are functionally indistinguishable from those of the other [formal] members." *Id.,* at 915. As a result, respondents argue, the NEPDG cannot benefit from the Act's exemption under subsection B and is subject to FACA's requirements.

Vice President Cheney, the NEPDG, the Government officials who served on the committee, and the alleged *de facto* members were named as defendants. The suit seeks declaratory relief and an injunction requiring them to produce all materials allegedly subject to FACA's requirements.

All defendants moved to dismiss. The District Court granted the motion in part and denied it in part. The court acknowledged FACA does not create a private cause of action. On this basis, it dismissed respondents' claims against

the non-Government defendants. Because the NEPDG had been dissolved, it could not be sued as a defendant; and the claims against it were dismissed as well. The District Court held, however, that FACA's substantive requirements could be enforced against the Vice President and other Government participants on the NEPDG under the Mandamus Act, 28 U. S. C. § 1361, and against the agency defendants under the Administrative Procedure Act (APA), 5 U. S. C. § 706. The District Court recognized the disclosure duty must be clear and nondiscretionary for mandamus to issue, and there must be, among other things, "final agency actions" for the APA to apply. According to the District Court, it was premature to decide these questions. It held only that respondents had alleged sufficient facts to keep the Vice President and the other defendants in the case.

The District Court deferred ruling on the Government's contention that to disregard the exemption and apply FACA to the NEPDG would violate principles of separation of powers and interfere with the constitutional prerogatives of the President and the Vice President. Instead, the court allowed respondents to conduct a "tightly-reined" discovery to ascertain the NEPDG's structure and membership, and thus to determine whether the *de facto* membership doctrine applies. *Judicial Watch, Inc.* v. *National Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 54 (DC 2002). While acknowledging that discovery itself might raise serious constitutional questions, the District Court explained that the Government could assert executive privilege to protect sensitive materials from disclosure. In the District Court's view, these "issues of executive privilege will be much more limited in scope than the broad constitutional challenge raised by the government." *Id.*, at 55. The District Court adopted this approach in an attempt to avoid constitutional questions, noting that if, after discovery, respondents have no evidentiary support for the allegations about the regular participation by lobbyists and industry executives on the NEPDG, the

Government can prevail on statutory grounds. Furthermore, the District Court explained, even were it appropriate to address constitutional issues, some factual development is necessary to determine the extent of the alleged intrusion into the Executive's constitutional authority. The court denied in part the motion to dismiss and ordered respondents to submit a discovery plan.

In due course the District Court approved respondents' discovery plan, entered a series of orders allowing discovery to proceed, see CADC App. 238, 263, 364 (reproducing orders entered on Sept. 9, Oct. 17, and Nov. 1, 2002), and denied the Government's motion for certification under 28 U. S. C. § 1292(b) with respect to the discovery orders. Petitioners sought a writ of mandamus in the Court of Appeals to vacate the discovery orders, to direct the District Court to rule on the basis of the administrative record, and to dismiss the Vice President from the suit. The Vice President also filed a notice of appeal from the same orders. See *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541 (1949); *United States* v. *Nixon*, 418 U. S. 683 (1974).

A divided panel of the Court of Appeals dismissed the petition for a writ of mandamus and the Vice President's attempted interlocutory appeal. *In re Cheney*, 334 F. 3d 1096 (CADC 2003). With respect to mandamus, the majority declined to issue the writ on the ground that alternative avenues of relief remained available. Citing *United States* v. *Nixon, supra*, the majority held that petitioners, to guard against intrusion into the President's prerogatives, must first assert privilege. Under its reading of *Nixon*, moreover, privilege claims must be made "'with particularity.'" 334 F. 3d, at 1104. In the majority's view, if the District Court sustains the privilege, petitioners will be able to obtain all the relief they seek. If the District Court rejects the claim of executive privilege and creates "an imminent risk of disclosure of allegedly protected presidential communications," "mandamus might well be appropriate to avoid letting 'the

cat . . . out of the bag.'" *Id.*, at 1104–1105. "But so long as the separation of powers conflict that petitioners anticipate remains hypothetical," the panel held, "we have no authority to exercise the extraordinary remedy of mandamus." *Id.*, at 1105. The majority acknowledged the scope of respondents' requests is overly broad, because it seeks far more than the "limited items" to which respondents would be entitled if "the district court ultimately determines that the NEPDG is subject to FACA." *Id.*, at 1105–1106; *id.*, at 1106 ("The requests to produce also go well beyond FACA's requirements"); *ibid.* ("[Respondents'] discovery also goes well beyond what they need to prove"). It nonetheless agreed with the District Court that petitioners "'shall bear the burden'" of invoking executive privilege and filing objections to the discovery orders with "'detailed precision.'" *Id.*, at 1105 (quoting Aug. 2, 2002, Order).

For similar reasons, the majority rejected the Vice President's interlocutory appeal. In *United States* v. *Nixon,* the Court held that the President could appeal an interlocutory subpoena order without having "to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review." 418 U. S., at 691. The majority, however, found the case inapplicable because Vice President Cheney, unlike then-President Nixon, had not yet asserted privilege. In the majority's view, the Vice President was not forced to choose between disclosure and suffering contempt for failure to obey a court order. The majority held that to require the Vice President to assert privilege does not create the unnecessary confrontation between two branches of Government described in *Nixon.*

Judge Randolph filed a dissenting opinion. In his view *AAPS' de facto* membership doctrine is mistaken, and the Constitution bars its application to the NEPDG. Allowing discovery to determine the applicability of the *de facto* membership doctrine, he concluded, is inappropriate. He would

have issued the writ of mandamus directing dismissal of the complaints. 334 F. 3d, at 1119.

We granted certiorari. 540 U. S. 1088 (2003). We now vacate the judgment of the Court of Appeals and remand the case for further proceedings to reconsider the Government's mandamus petition.

## II

As a preliminary matter, we address respondents' argument that the Government's petition for a writ of mandamus was jurisdictionally out of time or, alternatively, barred by the equitable doctrine of laches. According to respondents, because the Government's basic argument was one of discovery immunity—that is, it need not invoke executive privilege or make particular objections to the discovery requests—the mandamus petition should have been filed with the Court of Appeals within 60 days after the District Court denied the Government's motion to dismiss. See Fed. Rule App. Proc. 4(a)(1)(B) ("When the United States or its officer or agency is a party, the notice of appeal may be filed by any party within 60 days after the judgment or order appealed from is entered"). On this theory, the last day for making any filing to the Court of Appeals was September 9, 2002. The Government, however, did not file the mandamus petition and the notice of appeal until November 7, four months after the District Court issued the order that, under respondents' view, commenced the time for appeal.

As even respondents acknowledge, however, Rule 4(a), by its plain terms, applies only to the filing of a notice of appeal. Brief for Respondent Sierra Club 23. Rule 4(a) is inapplicable to the Government's mandamus petition under the All Writs Act, 28 U. S. C. § 1651. Because we vacate the Court of Appeals' judgment and remand the case for further proceedings for the court to consider whether a writ of mandamus should have issued, we need not decide whether the Vice President also could have appealed the District Court's or-

ders under *Nixon* and the collateral order doctrine. We express no opinion on whether the Vice President's notice of appeal was timely filed.

Respondents' argument that the mandamus petition was barred by laches does not withstand scrutiny. Laches might bar a petition for a writ of mandamus if the petitioner "slept upon his rights . . . , and especially if the delay has been prejudicial to the [other party], or to the rights of other persons," *Chapman* v. *County of Douglas*, 107 U. S. 348, 355 (1883). Here, the flurry of activity following the District Court's denial of the motion to dismiss overcomes respondents' argument that the Government neglected to assert its rights. The Government filed, among other papers, a motion for a protective order on September 3; a motion to stay pending appeal on October 21; and a motion for leave to appeal pursuant to 28 U. S. C. § 1292(b) on October 23. Even were we to agree that the baseline for measuring the timeliness of the Government's mandamus petition was the District Court's order denying the motion to dismiss, the Government's active litigation posture was far from the neglect or delay that would make the application of laches appropriate.

We do not accept, furthermore, respondents' argument that laches should apply because the motions filed by the Government following the District Court's denial of its motion to dismiss amounted to little more than dilatory tactics to "delay and obstruct the proceedings." Brief for Respondent Sierra Club 23. In light of the drastic nature of mandamus and our precedents holding that mandamus may not issue so long as alternative avenues of relief remain available, the Government cannot be faulted for attempting to resolve the dispute through less drastic means. The law does not put litigants in the impossible position of having to exhaust alternative remedies before petitioning for mandamus, on the one hand, and having to file the mandamus petition at the earliest possible moment to avoid laches, on the

other. The petition was properly before the Court of Appeals for its consideration.

### III

We now come to the central issue in the case—whether the Court of Appeals was correct to conclude it "ha[d] no authority to exercise the extraordinary remedy of mandamus," 334 F. 3d, at 1105, on the ground that the Government could protect its rights by asserting executive privilege in the District Court.

The common-law writ of mandamus against a lower court is codified at 28 U. S. C. § 1651(a): "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." This is a "drastic and extraordinary" remedy "reserved for really extraordinary causes." *Ex parte Fahey,* 332 U. S. 258, 259–260 (1947). "The traditional use of the writ in aid of appellate jurisdiction both at common law and in the federal courts has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction." *Roche* v. *Evaporated Milk Assn.,* 319 U. S. 21, 26 (1943). Although courts have not "confined themselves to an arbitrary and technical definition of 'jurisdiction,'" *Will* v. *United States,* 389 U. S. 90, 95 (1967), "only exceptional circumstances amounting to a judicial 'usurpation of power,'" *ibid.,* or a "clear abuse of discretion," *Bankers Life & Casualty Co.* v. *Holland,* 346 U. S. 379, 383 (1953), "will justify the invocation of this extraordinary remedy," *Will,* 389 U. S., at 95.

As the writ is one of "the most potent weapons in the judicial arsenal," *id.,* at 107, three conditions must be satisfied before it may issue. *Kerr* v. *United States Dist. Court for Northern Dist. of Cal.,* 426 U. S. 394, 403 (1976). First, "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires," *ibid.*—a condition designed to ensure that the writ will not be used as a

substitute for the regular appeals process, *Fahey, supra,* at 260. Second, the petitioner must satisfy "'the burden of showing that [his] right to issuance of the writ is "clear and indisputable."'" *Kerr, supra,* at 403 (quoting *Bankers Life & Casualty Co., supra,* at 384). Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances. *Kerr, supra,* at 403 (citing *Schlagenhauf* v. *Holder,* 379 U. S. 104, 112, n. 8 (1964)). These hurdles, however demanding, are not insuperable. This Court has issued the writ to restrain a lower court when its actions would threaten the separation of powers by "embarrass[ing] the executive arm of the Government," *Ex parte Peru,* 318 U. S. 578, 588 (1943), or result in the "intrusion by the federal judiciary on a delicate area of federal-state relations," *Will, supra,* at 95 (citing *Maryland* v. *Soper (No. 1),* 270 U. S. 9 (1926)).

Were the Vice President not a party in the case, the argument that the Court of Appeals should have entertained an action in mandamus, notwithstanding the District Court's denial of the motion for certification, might present different considerations. Here, however, the Vice President and his comembers on the NEPDG are the subjects of the discovery orders. The mandamus petition alleges that the orders threaten "substantial intrusions on the process by which those in closest operational proximity to the President advise the President." App. 343. These facts and allegations remove this case from the category of ordinary discovery orders where interlocutory appellate review is unavailable, through mandamus or otherwise. It is well established that "a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any 'ordinary individual.'" *United States* v. *Nixon,* 418 U. S., at 715. Chief Justice Marshall, sitting as a trial judge, recognized the unique position of the Executive Branch when he stated that "[i]n no case . . . would a court be required to

proceed against the president as against an ordinary individual." *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807). See also *Clinton* v. *Jones*, 520 U. S. 681, 698–699 (1997) ("We have, in short, long recognized the 'unique position in the constitutional scheme' that [the Office of the President] occupies" (quoting *Nixon* v. *Fitzgerald*, 457 U. S. 731, 749 (1982))); 520 U. S., at 710–724 (BREYER, J., concurring in judgment). As *United States* v. *Nixon* explained, these principles do not mean that the "President is above the law." 418 U. S., at 715. Rather, they simply acknowledge that the public interest requires that a coequal branch of Government "afford Presidential confidentiality the greatest protection consistent with the fair administration of justice," *ibid.*, and give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties.

These separation-of-powers considerations should inform a court of appeals' evaluation of a mandamus petition involving the President or the Vice President. Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities. See *Ex parte Peru, supra,* at 587 (recognizing jurisdiction to issue the writ because "the action of the political arm of the Government taken within its appropriate sphere [must] be promptly recognized, and . . . delay and inconvenience of a prolonged litigation [must] be avoided by prompt termination of the proceedings in the district court"); see also *Clinton* v. *Jones, supra,* at 701 ("We have recognized that '[e]ven when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties'" (quoting *Loving* v. *United States*, 517 U. S. 748, 757 (1996))).

## IV

The Court of Appeals dismissed these separation-of-powers concerns. Relying on *United States* v. *Nixon*, it held that even though respondents' discovery requests are overbroad and "go well beyond FACA's requirements," the Vice President and his former colleagues on the NEPDG " 'shall bear the burden' " of invoking privilege with narrow specificity and objecting to the discovery requests with " 'detailed precision.' " 334 F. 3d, at 1105–1106. In its view, this result was required by *Nixon*'s rejection of an "absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." 418 U. S., at 706. If *Nixon* refused to recognize broad claims of confidentiality where the President had asserted executive privilege, the majority reasoned, *Nixon* must have rejected, *a fortiori*, petitioners' claim of discovery immunity where the privilege has not even been invoked. According to the majority, because the Executive Branch can invoke executive privilege to maintain the separation of powers, mandamus relief is premature.

This analysis, however, overlooks fundamental differences in the two cases. *Nixon* cannot bear the weight the Court of Appeals puts upon it. First, unlike this case, which concerns respondents' requests for information for use in a civil suit, *Nixon* involves the proper balance between the Executive's interest in the confidentiality of its communications and the "constitutional need for production of relevant evidence in a criminal proceeding." *Id.*, at 713. The Court's decision was explicit that it was "not . . . concerned with the balance between the President's generalized interest in confidentiality and the need for relevant evidence in civil litigation . . . . We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials." *Id.*, at 712, n. 19.

The distinction *Nixon* drew between criminal and civil proceedings is not just a matter of formalism. As the Court explained, the need for information in the criminal context is much weightier because "our historic[al] commitment to the rule of law . . . is nowhere more profoundly manifest than in our view that 'the twofold aim [of criminal justice] is that guilt shall not escape or innocence suffer.'" *Id.*, at 708–709 (quoting *Berger* v. *United States*, 295 U. S. 78, 88 (1935)). In light of the "fundamental" and "comprehensive" need for "every man's evidence" in the criminal justice system, 418 U. S., at 709, 710, not only must the Executive Branch first assert privilege to resist disclosure, but privilege claims that shield information from a grand jury proceeding or a criminal trial are not to be "expansively construed, for they are in derogation of the search for truth," *id.*, at 710. The need for information for use in civil cases, while far from negligible, does not share the urgency or significance of the criminal subpoena requests in *Nixon*. As *Nixon* recognized, the right to production of relevant evidence in civil proceedings does not have the same "constitutional dimensions." *Id.*, at 711.

The Court also observed in *Nixon* that a "primary constitutional duty of the Judicial Branch [is] to do justice in criminal prosecutions." *Id.*, at 707. Withholding materials from a tribunal in an ongoing criminal case when the information is necessary to the court in carrying out its tasks "conflict[s] with the function of the courts under Art. III." *Ibid.* Such an impairment of the "essential functions of [another] branch," *ibid.*, is impermissible. Withholding the information in this case, however, does not hamper another branch's ability to perform its "essential functions" in quite the same way. *Ibid.* The District Court ordered discovery here, not to remedy known statutory violations, but to ascertain whether FACA's disclosure requirements even apply to the NEPDG in the first place. Even if FACA embodies important congressional objectives, the only consequence from re-

spondents' inability to obtain the discovery they seek is that it would be more difficult for private complainants to vindicate Congress' policy objectives under FACA. And even if, for argument's sake, the reasoning in Judge Randolph's dissenting opinion in the end is rejected and FACA's statutory objectives would be to some extent frustrated, it does not follow that a court's Article III authority or Congress' central Article I powers would be impaired. The situation here cannot, in fairness, be compared to *Nixon*, where a court's ability to fulfill its constitutional responsibility to resolve cases and controversies within its jurisdiction hinges on the availability of certain indispensable information.

A party's need for information is only one facet of the problem. An important factor weighing in the opposite direction is the burden imposed by the discovery orders. This is not a routine discovery dispute. The discovery requests are directed to the Vice President and other senior Government officials who served on the NEPDG to give advice and make recommendations to the President. The Executive Branch, at its highest level, is seeking the aid of the courts to protect its constitutional prerogatives. As we have already noted, special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated. This Court has held, on more than one occasion, that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery," *Clinton*, 520 U. S., at 707, and that the Executive's "constitutional responsibilities and status [are] factors counseling judicial deference and restraint" in the conduct of litigation against it, *Nixon* v. *Fitzgerald*, 457 U. S., at 753. Respondents' reliance on cases that do not involve senior members of the Executive Branch, see, *e. g.*, *Kerr* v. *United States Dist. Court for Northern Dist. of Cal.*, 426 U. S. 394 (1976), is altogether misplaced.

Even when compared against *United States* v. *Nixon's* criminal subpoenas, which did involve the President, the civil discovery here militates against respondents' position. The observation in *Nixon* that production of confidential information would not disrupt the functioning of the Executive Branch cannot be applied in a mechanistic fashion to civil litigation. In the criminal justice system, there are various constraints, albeit imperfect, to filter out insubstantial legal claims. The decision to prosecute a criminal case, for example, is made by a publicly accountable prosecutor subject to budgetary considerations and under an ethical obligation, not only to win and zealously to advocate for his client but also to serve the cause of justice. The rigors of the penal system are also mitigated by the responsible exercise of prosecutorial discretion. In contrast, there are no analogous checks in the civil discovery process here. Although under Federal Rule of Civil Procedure 11, sanctions are available, and private attorneys also owe an obligation of candor to the judicial tribunal, these safeguards have proved insufficient to discourage the filing of meritless claims against the Executive Branch. "In view of the visibility of" the Offices of the President and the Vice President and "the effect of [their] actions on countless people," they are "easily identifiable target[s] for suits for civil damages." *Nixon* v. *Fitzgerald, supra,* at 753.

Finally, the narrow subpoena orders in *United States* v. *Nixon* stand on an altogether different footing from the overly broad discovery requests approved by the District Court in this case. The criminal subpoenas in *Nixon* were required to satisfy exacting standards of "(1) relevancy; (2) admissibility; (3) specificity." 418 U. S., at 700 (interpreting Fed. Rule Crim. Proc. 17(c)). They were "not intended to provide a means of discovery." 418 U. S., at 698. The burden of showing these standards were met, moreover, fell on the party requesting the information. *Id.,* at 699 ("[I]n order to require production prior to trial, the moving party

must show [that the applicable standards are met]"). In *Nixon,* the Court addressed the issue of executive privilege only after having satisfied itself that the special prosecutor had surmounted these demanding requirements. *Id.,* at 698 ("If we sustained this [Rule 17(c)] challenge, there would be no occasion to reach the claim of privilege asserted with respect to the subpoenaed material"). The very specificity of the subpoena requests serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.

In contrast to *Nixon*'s subpoena orders that "precisely identified" and "specific[ally] . . . enumerated" the relevant materials, *id.,* at 688, and n. 5, the discovery requests here, as the panel majority acknowledged, ask for everything under the sky:

"1. All documents identifying or referring to any staff, personnel, contractors, consultants or employees of the Task Force.

"2. All documents establishing or referring to any Sub-Group.

"3. All documents identifying or referring to any staff, personnel, contractors, consultants or employees of any Sub-Group.

"4. All documents identifying or referring to any other persons participating in the preparation of the Report or in the activities of the Task Force or any Sub-Group.

"5. All documents concerning any communication relating to the activities of the Task Force, the activities of any Sub-Groups, or the preparation of the Report . . . .

"6. All documents concerning any communication relating to the activities of the Task Force, the activities of Sub-Groups, or the preparation of the Report between any person . . . and [a list of agencies]." App. 220–221.

The preceding excerpt from respondents' "*First* Request for Production of Documents," *id.,* at 215 (emphasis added),

is only the beginning. Respondents' "First Set of Interrogatories" are similarly unbounded in scope. *Id.*, at 224. Given the breadth of the discovery requests in this case compared to the narrow subpoena orders in *United States* v. *Nixon*, our precedent provides no support for the proposition that the Executive Branch "shall bear the burden" of invoking executive privilege with sufficient specificity and of making particularized objections. 334 F. 3d, at 1105. To be sure, *Nixon* held that the President cannot, through the assertion of a "broad [and] undifferentiated" need for confidentiality and the invocation of an "absolute, unqualified" executive privilege, withhold information in the face of subpoena orders. 418 U. S., at 706, 707. It did so, however, only after the party requesting the information—the special prosecutor—had satisfied his burden of showing the propriety of the requests. Here, as the Court of Appeals acknowledged, the discovery requests are anything but appropriate. They provide respondents all the disclosure to which they would be entitled in the event they prevail on the merits, and much more besides. In these circumstances, *Nixon* does not require the Executive Branch to bear the onus of critiquing the unacceptable discovery requests line by line. Our precedents suggest just the opposite. See, *e. g., Clinton* v. *Jones*, 520 U. S. 681 (1997); *id.*, at 705 (holding that the Judiciary may direct "appropriate process" to the Executive); *Nixon* v. *Fitzgerald*, 457 U. S., at 753.

The Government, however, did in fact object to the scope of discovery and asked the District Court to narrow it in some way. Its arguments were ignored. See App. 167, 181–183 (arguing "this case can be resolved far short of the wide-ranging inquiries plaintiffs have proposed" and suggesting alternatives to "limi[t]" discovery); *id.*, at 232 ("Defendants object to the scope of plaintiffs' discovery requests and to the undue burden imposed by them. The scope of plaintiffs' requests is broader than that reasonably calculated to lead to admissible evidence"); *id.*, at 232, n. 10 ("We state

our general objections here for purposes of clarity for the record and to preclude any later argument that, by not including them here, those general objections have been waived"). In addition, the Government objected to the burden that would arise from the District Court's insistence that the Vice President winnow the discovery orders by asserting specific claims of privilege and making more particular objections. *Id.*, at 201 (Tr. of Status Hearing (Aug. 2, 2002)) (noting "concerns with disrupting the effective functioning of the presidency and the vice-presidency"); *id.*, at 274 ("[C]ompliance with the order of the court imposes a burden on the Office of the Vice President. That is a real burden. If we had completed and done everything that Your Honor has asked us to do today that burden would be gone, but it would have been realized"). These arguments, too, were rejected. See *id.*, at 327, 329 (Nov. 1, 2002, Order) (noting that the court had, "on numerous occasions," rejected the Government's assertion "that court orders requiring [it] to respond in any fashion to [the] discovery requests creates an 'unconstitutional burden' on the Executive Branch").

Contrary to the District Court's and the Court of Appeals' conclusions, *Nixon* does not leave them the sole option of inviting the Executive Branch to invoke executive privilege while remaining otherwise powerless to modify a party's overly broad discovery requests. Executive privilege is an extraordinary assertion of power "not to be lightly invoked." *United States* v. *Reynolds*, 345 U. S. 1, 7 (1953). Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. These "occasion[s] for constitutional confrontation between the two

branches" .should be avoided whenever possible. *United States* v. *Nixon, supra,* at 692.

In recognition of these concerns, there is sound precedent in the District of Columbia itself for district courts to explore other avenues, short of forcing the Executive to invoke privilege, when they are asked to enforce against the Executive Branch unnecessarily broad subpoenas. In *United States* v. *Poindexter,* 727 F. Supp. 1501 (1989), defendant Poindexter, on trial for criminal charges, sought to have the District Court enforce subpoena orders against President Reagan to obtain allegedly exculpatory materials. The Executive considered the subpoenas "unreasonable and oppressive." *Id.,* at 1503. Rejecting defendant's argument that the Executive must first assert executive privilege to narrow the subpoenas, the District Court agreed with the President that "it is undesirable as a matter of constitutional and public policy to compel a President to make his decision on privilege with respect to a large array of documents." *Ibid.* The court decided to narrow, on its own, the scope of the subpoenas to allow the Executive "to consider whether to invoke executive privilege with respect to . . . a possibly smaller number of documents following the narrowing of the subpoenas." *Id.,* at 1504. This is but one example of the choices available to the District Court and the Court of Appeals in this case.

As we discussed at the outset, under principles of mandamus jurisdiction, the Court of Appeals may exercise its power to issue the writ only upon a finding of "exceptional circumstances amounting to a judicial 'usurpation of power,'" *Will,* 389 U. S., at 95, or a "clear abuse of discretion," *Bankers Life,* 346 U. S., at 383. As this case implicates the separation of powers, the Court of Appeals must also ask, as part of this inquiry, whether the District Court's actions constituted an unwarranted impairment of another branch in the performance of its constitutional duties. This is especially so here because the District Court's analysis of whether mandamus relief is appropriate should itself be constrained

by principles similar to those we have outlined, *supra*, at 380–382, that limit the Court of Appeals' use of the remedy. The panel majority, however, failed to ask this question. Instead, it labored under the mistaken assumption that the assertion of executive privilege is a necessary precondition to the Government's separation-of-powers objections.

## V

In the absence of overriding concerns of the sort discussed in *Schlagenhauf*, 379 U. S., at 111 (discussing, among other things, the need to avoid "piecemeal litigation" and to settle important issues of first impression in areas where this Court bears special responsibility), we decline petitioners' invitation to direct the Court of Appeals to issue the writ against the District Court. Moreover, this is not a case where, after having considered the issues, the Court of Appeals abused its discretion by failing to issue the writ. Instead, the Court of Appeals, relying on its mistaken reading of *United States* v. *Nixon*, prematurely terminated its inquiry after the Government refused to assert privilege and did so without even reaching the weighty separation-of-powers objections raised in the case, much less exercised its discretion to determine whether "the writ is appropriate under the circumstances." *Supra*, at 381. Because the issuance of the writ is a matter vested in the discretion of the court to which the petition is made, and because this Court is not presented with an original writ of mandamus, see, *e. g., Ex parte Peru*, 318 U. S., at 586, we leave to the Court of Appeals to address the parties' arguments with respect to the challenge to *AAPS* and the discovery orders. Other matters bearing on whether the writ of mandamus should issue should also be addressed, in the first instance, by the Court of Appeals after considering any additional briefs and arguments as it deems appropriate. We note only that all courts should be mindful of the burdens imposed on the Executive Branch in any future proceedings. Special consider-

ations applicable to the President and the Vice President suggest that the courts should be sensitive to requests by the Government for interlocutory appeals to reexamine, for example, whether the statute embodies the *de facto* membership doctrine.

The judgment of the Court of Appeals for the District of Columbia is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

Broad discovery should be encouraged when it serves the salutary purpose of facilitating the prompt and fair resolution of concrete disputes. In the normal case, it is entirely appropriate to require the responding party to make particularized objections to discovery requests. In some circumstances, however, the requesting party should be required to assume a heavy burden of persuasion before any discovery is allowed. Two interrelated considerations support taking that approach in this case: the nature of the remedy respondents requested from the District Court, and the nature of the statute they sought to enforce.

As relevant here, respondents, Judicial Watch, Inc., and Sierra Club, sought a writ of mandamus under 28 U. S. C. § 1361. Mandamus is an extraordinary remedy, available to "a plaintiff only if . . . the defendant owes him a clear nondiscretionary duty." *Heckler* v. *Ringer*, 466 U. S. 602, 616 (1984). Thus, to persuade the District Court that they were entitled to mandamus relief, respondents had to establish that petitioners had a nondiscretionary duty to comply with the Federal Advisory Committee Act (FACA), 5 U. S. C. App. § 1 *et seq.*, p. 1, and in particular with FACA's requirement that "records related to the advisory committee's work be made public"—the only requirement still enforceable if, as respondent Sierra Club concedes, the National Energy Policy Development Group (NEPDG) no longer exists. See *Ju-*

*dicial Watch, Inc.* v. *National Energy Policy Dev. Group,* 219 F. Supp. 2d 20, 42 (DC 2002). Relying on the Court of Appeals' novel *de facto* member doctrine, *ante,* at 374, respondents sought to make that showing by obtaining the very records to which they will be entitled if they win their lawsuit. In other words, respondents sought to obtain, through discovery, information about the NEPDG's work in order to establish their entitlement *to the same information.*

Thus, granting broad discovery in this case effectively prejudged the merits of respondents' claim for mandamus relief—an outcome entirely inconsistent with the extraordinary nature of the writ. Under these circumstances, instead of requiring petitioners to object to particular discovery requests, the District Court should have required respondents to demonstrate that particular requests would tend to establish their theory of the case.\* I therefore think it would have been appropriate for the Court of Appeals to vacate the District Court's discovery order. I nevertheless join the Court's opinion and judgment because, as the architect of the *de facto* member doctrine, the Court of Appeals is the appropriate forum to direct future proceedings in the case.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

I agree that "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Kerr* v. *United States Dist. Court for Northern Dist. of Cal.,* 426 U. S. 394, 402 (1976). In framing our review of the Court of Appeals' judgment, the Court recognizes this hurdle, observing that "the petitioner must satisfy 'the burden of showing

---

\*A few interrogatories or depositions might have determined, for example, whether any non-Government employees voted on NEPDG recommendations or drafted portions of the committee's report. In my view, only substantive participation of this nature would even arguably be sufficient to warrant classifying a non-Government employee as a *de facto* committee member.

that [his] right to issuance of the writ is clear and indisputable.'" *Ante*, at 381 (quoting *Kerr, supra*, at 403 (internal quotation marks omitted)). But in reaching its disposition, the Court barely mentions the fact that respondents, Judicial Watch, Inc., and Sierra Club, face precisely the same burden to obtain relief from the District Court. The proper question presented to the Court of Appeals was not only whether it is clear and indisputable that petitioners have a right to an order "'vacat[ing] the discovery orders issued by the district court, direct[ing] the court to decide the case on the basis of the administrative record and such supplemental affidavits as it may require, and direct[ing] that the Vice President be dismissed as a defendant.'" 334 F. 3d 1096, 1101 (CADC 2003) (quoting Emergency Pet. for Writ of Mandamus in *In re Cheney*, in No. 02–5354 (CADC)). The question with which the Court of Appeals was faced also necessarily had to account for the fact that respondents sought mandamus relief in the District Court. Because they proceeded by mandamus, respondents had to demonstrate in the District Court a clear and indisputable right to the Federal Advisory Committee Act (FACA) materials. If respondents' right to the materials was not clear and indisputable, then petitioners' right to relief in the Court of Appeals was clear.

One need look no further than the District Court's opinion to conclude respondents' right to relief in the District Court was unclear and hence that mandamus would be unavailable. Indeed, the District Court acknowledged this Court's recognition "that applying FACA to meetings among Presidential advisors 'present[s] formidable constitutional difficulties.'" *Judicial Watch, Inc.* v. *National Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 47 (DC 2002) (quoting *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 466 (1989)).

Putting aside the serious constitutional questions raised by respondents' challenge, the District Court could not even

determine whether FACA applies to the National Energy Policy Development Group (NEPDG) as a statutory matter. 219 F. Supp. 2d, at 54–55 (noting the possibility that, after discovery, petitioners might prevail on summary judgment on statutory grounds). I acknowledge that under the Court of Appeals' *de facto* member doctrine, see *Association of American Physicians & Surgeons, Inc.* v. *Clinton*, 997 F. 2d 898, 915 (CADC 1993), a district court is authorized to undertake broad discovery to determine whether FACA's Government employees exception, 5 U. S. C. App. § 3(2)(C)(i), p. 2, applies. But, application of the *de facto* member doctrine to authorize broad discovery into the inner workings of the NEPDG has the same potential to offend the Constitution's separation of powers as the actual application of FACA to the NEPDG itself. 334 F. 3d, at 1114–1115 (Randolph, J., dissenting). Thus, the existence of this doctrine cannot support the District Court's actions here. If respondents must conduct wide-ranging discovery in order to prove that they have *any* right to relief—much less that they have a clear and indisputable right to relief—mandamus is unwarranted, and the writ should not issue.

Although the District Court might later conclude that FACA applies to the NEPDG as a statutory matter and that such application is constitutional, the mere fact that the District Court *might* rule in respondents' favor cannot establish the clear right to relief necessary for mandamus. Otherwise, the writ of mandamus could turn into a freestanding cause of action for plaintiffs seeking to enforce virtually any statute, even those that provide no such private remedy.

Because the District Court clearly exceeded its authority in this case, I would reverse the judgment of the Court of Appeals and remand the case with instruction to issue the writ.\*

---

\*I join Parts I, II, III, and IV of the Court's opinion.

JUSTICE GINSBURG, with whom JUSTICE SOUTER joins, dissenting.

The Government, in seeking a writ of mandamus from the Court of Appeals for the District of Columbia, and on brief to this Court, urged that this case should be resolved without *any* discovery. See App. 183–184, 339; Brief for Petitioners 45; Reply Brief 18. In vacating the judgment of the Court of Appeals, however, this Court remands for consideration whether mandamus is appropriate due to the *overbreadth* of the District Court's discovery orders. See *ante*, at 372–373, 387–390. But, as the Court of Appeals observed, it appeared that the Government "never asked the district court to *narrow* discovery." *In re Cheney*, 334 F. 3d 1096, 1106 (CADC 2003) (emphasis in original). Given the Government's decision to resist all discovery, mandamus relief based on the exorbitance of the discovery orders is at least "premature," *id.*, at 1104. I would therefore affirm the judgment of the Court of Appeals denying the writ,[1] and allow the District Court, in the first instance, to pursue its expressed intention "tightly [to] rei[n] [in] discovery," 219 F. Supp. 2d 20, 54 (DC 2002), should the Government so request.

I

A

The discovery at issue here was sought in a civil action filed by respondents Judicial Watch, Inc., and Sierra Club.

---

[1] The Court of Appeals also concluded, altogether correctly in my view, that it lacked ordinary appellate jurisdiction over the Vice President's appeal. See 334 F. 3d, at 1109; cf. *ante*, at 378–379 (leaving appellate-jurisdiction question undecided). In its order addressing the petitioners' motions to dismiss, the District Court stated "it would be premature and inappropriate to determine whether" any relief could be obtained from the Vice President. *Judicial Watch, Inc. v. National Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 44 (DC 2002). Immediate review of an interlocutory ruling, allowed in rare cases under the collateral-order doctrine, is inappropriate when an order is, as in this case, "inherently tentative" and not "the final word on the subject." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U. S. 271, 277 (1988) (internal quotation marks omitted).

To gain information concerning the membership and operations of an energy-policy task force, the National Energy Policy Development Group (NEPDG), respondents filed suit under the Federal Advisory Committee Act (FACA), 5 U. S. C. App. § 1 *et seq.*, p. 1; respondents named among the defendants the Vice President and senior Executive Branch officials. See App. 16–40, 139–154; *ante*, at 373–374. After granting in part and denying in part the Government's motions to dismiss, see 219 F. Supp. 2d 20, the District Court approved respondents' extensive discovery plan, which included detailed and far-ranging interrogatories and sweeping requests for production of documents, see App. to Pet. for Cert. 51a; App. 215–230. In a later order, the District Court directed the Government to "produce non-privileged documents and a privilege log." App. to Pet. for Cert. 47a.

The discovery plan drawn by Judicial Watch and Sierra Club was indeed "unbounded in scope." *Ante*, at 388; accord 334 F. 3d, at 1106. Initial approval of that plan by the District Court, however, was not given in stunning disregard of separation-of-powers concerns. Cf. *ante*, at 387–391. In the order itself, the District Court invited "detailed and precise object[ions]" to any of the discovery requests, and instructed the Government to "identify and explain . . . invocations of privilege with particularity." App. to Pet. for Cert. 51a. To avoid duplication, the District Court provided that the Government could identify "documents or information [responsive to the discovery requests] that [it] ha[d] already released to [Judicial Watch or the Sierra Club] in different fora." *Ibid.*[2] Anticipating further proceedings concerning discovery, the District Court suggested that the Government could "submit [any privileged documents] under seal for the court's consideration," or that "the court [could] appoint the equivalent of a Special Master, maybe a retired judge," to review allegedly privileged documents. App. 247.

---

[2] Government agencies had produced some relevant documents in related Freedom of Information Act litigation. See 219 F. Supp. 2d, at 27.

The Government did not file specific objections; nor did it supply particulars to support assertions of privilege. Instead, the Government urged the District Court to rule that Judicial Watch and the Sierra Club could have no discovery at all. See *id.*, at 192 ("the governmen[t] position is that . . . no discovery is appropriate"); *id.*, at 205 (same); 334 F. 3d, at 1106 ("As far as we can tell, petitioners never asked the district court to *narrow* discovery to those matters [respondents] need to support their allegation that FACA applies to the NEPDG." (emphasis in original)). In the Government's view, "the resolution of the case ha[d] to flow from the administrative record" *sans* discovery. App. 192. Without taking up the District Court's suggestion of that court's readiness to rein in discovery, see 219 F. Supp. 2d, at 54, the Government, on behalf of the Vice President, moved, unsuccessfully, for a protective order and for certification of an interlocutory appeal pursuant to 28 U. S. C. § 1292(b). See 334 F. 3d, at 1100; see App. to Pet. for Cert. 47a (District Court denial of protective order); 233 F. Supp. 2d 16 (DC 2002) (District Court denial of § 1292(b) certification).[3] At the District Court's hearing on the Government's motion for a stay pending interlocutory appeal, the Government argued that "the injury is submitting to discovery in the absence of a compelling showing of need by the [respondents]." App. 316; see 230 F. Supp. 2d 12 (DC 2002) (District Court order denying stay).

Despite the absence from this "flurry of activity," *ante*, at 379, of any Government motion contesting the terms of the discovery plan or proposing a scaled-down substitute plan, see 334 F. 3d, at 1106, this Court states that the Government

---

[3] Section 1292(b) of Title 28 allows a court of appeals, "in its discretion," to entertain an appeal from an interlocutory order "[w]hen a district judge . . . shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

"did in fact object to the scope of discovery and asked the District Court to narrow it in some way," *ante*, at 388. In support of this statement, the Court points to the Government's objections to the proposed discovery plan, its response to the interrogatories and production requests, and its contention that discovery would be unduly burdensome. See *ante*, at 388–389; App. 166–184, 201, 231–234, 274.

True, the Government disputed the definition of the term "meeting" in respondents' interrogatories, and stated, in passing, that "discovery should be [both] limited to written interrogatories" and "limited in scope to the issue of membership." *Id.*, at 179, 181, 233.[4] But as the Court of Appeals noted, the Government mentioned "excessive discovery" in support of its plea to be shielded from any discovery. 334 F. 3d, at 1106. The Government argument that "the burden of doing a document production is an unconstitutional burden," App. 274, was similarly anchored. The Government so urged at a District Court hearing in which its underlying "position [was] that it's not going to produce anything," *id.*, at 249.[5]

---

[4] On limiting discovery to the issue of membership, the Court of Appeals indicated its agreement. See 334 F. 3d, at 1106 ("[Respondents] have no need for the names of all persons who participated in [NEPDG]'s activities, nor a description of each person's role in the activities of [NEPDG]. They must discover only whether non-federal officials participated, and if so, to what extent." (internal quotation marks, ellipsis, and brackets omitted)).

[5] According to the Government, "24 boxes of materials [are] potentially responsive to [respondents'] discovery requests. . . . The documents identified as likely to be responsive from those boxes . . . are contained in approximately twelve boxes." App. 282–283. Each box "requires one to two attorney days to review and prepare a rough privilege log. Following that review, privilege logs must be finalized. Further, once the responsive emails are identified, printed, and numbered, [petitioners] expect that the privilege review and logging process [will] be equally, if not more, time-consuming, due to the expected quantity of individual emails." *Id.*, at 284.

The Government's bottom line was firmly and consistently that "review, limited to the administrative record, should frame the resolution of this case." *Id.*, at 181; accord *id.*, at 179, 233. That administrative record would "consist of the Presidential Memorandum establishing NEPDG, NEPDG's public report, and the Office of the Vice President's response to . . . Judicial Watch's request for permission to attend NEPDG meetings"; it would not include anything respondents could gain through discovery. *Id.*, at 183. Indeed, the Government acknowledged before the District Court that its litigation strategy involved opposition to the discovery plan as a whole in lieu of focused objections. See *id.*, at 205 (Government stated: "We did not choose to offer written objections to [the discovery plan] . . . .").

Further sounding the Government's leitmotif, in a hearing on the proposed discovery plan, the District Court stated that the Government "didn't file objections" to rein in discovery "because [in the Government's view] no discovery is appropriate." *Id.*, at 192; *id.*, at 205 (same). Without endeavoring to correct any misunderstanding on the District Court's part, the Government underscored its resistance to any and all discovery. *Id.*, at 192–194; *id.*, at 201 (asserting that respondents are "not entitled to discovery to supplement [the administrative record]"). And in its motion for a protective order, the Government similarly declared its unqualified opposition to discovery. See Memorandum in Support of Defendants' Motion for a Protective Order and for Reconsideration, C. A. Nos. 01–1530 (EGS), 02–631 (EGS), p. 21 (D. D. C., Sept. 3, 2002) ("[Petitioners] respectfully request that the Court enter a protective order relieving them of *any obligation* to respond to [respondents'] discovery [requests]." (emphasis added)); see 334 F. 3d, at 1106 (same).[6]

---

[6] The agency petitioners, in responses to interrogatories, gave rote and hardly illuminating responses refusing "on the basis of executive and deliberative process privileges" to be more forthcoming. See, *e. g.*, Defendant Department of Energy's Response to Plaintiffs' First Set of Interroga-

The District Court, in short, "ignored" no concrete pleas to "narrow" discovery. But see *ante*, at 388–390. That court did, however, voice its concern about the Government's failure to heed the court's instructions:

> "I told the government, if you have precise constitutional objections, let me know what they are so I can determine whether or not this [discovery] plan is appropriate, and . . . you said, well, it's unconstitutional, without elaborating. You said, because Plaintiffs' proposed discovery plan has not been approved by the court, the Defendants are not submitting specific objections to Plaintiffs' proposed request. . . . My rule was, if you have objections, let me know what the objections are, and you chose not to do so." App. 205.

## B

Denied § 1292(b) certification by the District Court, the Government sought a writ of mandamus from the Court of Appeals. See *id.*, at 339–365. In its mandamus petition, the Government asked the appellate court to "vacate the discovery orders issued by the district court, direct the court to decide the case on the basis of the administrative record and such supplemental affidavits as it may require, and direct that the Vice President be dismissed as a defendant." *Id.*, at 364–365. In support of those requests, the Government again argued that the case should be adjudicated without discovery: "The Constitution and principles of comity preclude discovery of the President or Vice President, especially without a demonstration of compelling and focused countervailing interest." *Id.*, at 360.

The Court of Appeals acknowledged that the discovery plan presented by respondents and approved by the District

tories, C. A. Nos. 01–1530 (EGS), 02–631 (EGS) (D. D. C., Sept. 3, 2002); Defendant United States Office of Management and Budget's Response to Plaintiffs' First Set of Interrogatories, C. A. Nos. 01–1530 (EGS), 02–631 (EGS) (D. D. C., Sept. 3, 2002).

Court "goes well beyond what [respondents] need." 334 F. 3d, at 1106. The appellate court nevertheless denied the mandamus petition, concluding that the Government's separation-of-powers concern "remain[ed] hypothetical." *Id.*, at 1105. Far from ordering immediate "disclosure of communications between senior executive branch officials and those with information relevant to advice that was being formulated for the President," the Court of Appeals observed, the District Court had directed the Government initially to produce only "non-privileged documents and a privilege log." *Id.*, at 1104 (citation and internal quotation marks omitted); see App. to Pet. for Cert. 47a.[7]

The Court of Appeals stressed that the District Court could accommodate separation-of-powers concerns short of denying all discovery or compelling the invocation of executive privilege. See 334 F. 3d, at 1105–1106. Principally, the Court of Appeals stated, discovery could be narrowed, should the Government so move, to encompass only "whether non-federal officials participated [in NEPDG], and if so, to what extent." *Id.*, at 1106. The Government could identify relevant materials produced in other litigation, thus avoiding undue reproduction. *Id.*, at 1105; see App. to Pet. for Cert. 51a; *supra*, at 397. If, after appropriate narrowing, the discovery allowed still impels "the Vice President . . . to claim privilege," the District Court could "entertain [those] privilege claims" and "review allegedly privileged documents in camera." 334 F. 3d, at 1107. Mindful of "the judiciary's responsibility to police the separation of powers in litigation involving the executive," the Court of Appeals

---

[7] The Court suggests that the appeals court "labored under the mistaken assumption that the assertion of executive privilege is a necessary precondition to the Government's separation-of-powers objections." *Ante*, at 391. The Court of Appeals, however, described the constitutional concern as "hypothetical," not merely because no executive privilege had been asserted, but also in light of measures the District Court could take to "narrow" and "carefully focu[s]" discovery. See 334 F. 3d, at 1105, 1107.

expressed confidence that the District Court would "respond to petitioners' concern and narrow discovery to ensure that [respondents] obtain no more than they need to prove their case." *Id.*, at 1106.

## II

"This Court repeatedly has observed that the writ of mandamus is an extraordinary remedy, to be reserved for extraordinary situations." *Gulfstream Aerospace Corp.* v. *Mayacamas Corp.*, 485 U. S. 271, 289 (1988) (citing *Kerr* v. *United States Dist. Court for Northern Dist. of Cal.*, 426 U. S. 394, 402 (1976)); see *ante*, at 380–381 (same). As the Court reiterates, "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires." *Kerr*, 426 U. S., at 403 (citing *Roche* v. *Evaporated Milk Assn.*, 319 U. S. 21, 26 (1943)); *ante*, at 380–381.

Throughout this litigation, the Government has declined to move for reduction of the District Court's discovery order to accommodate separation-of-powers concerns. See *supra*, at 398–402. The Court now remands this case so the Court of Appeals can consider whether a mandamus writ should issue ordering the District Court to "explore other avenues, short of forcing the Executive to invoke privilege," and, in particular, to "narrow, on its own, the scope of [discovery]." *Ante*, at 390. Nothing in the District Court's orders or the Court of Appeals' opinion, however, suggests that either of those courts would refuse reasonably to accommodate separation-of-powers concerns. See *supra*, at 397, 398, 401–402, and this page. When parties seeking a mandamus writ decline to avail themselves of opportunities to obtain relief from the District Court, a writ of mandamus ordering the same relief—*i. e.*, here, reined-in discovery—is surely a doubtful proposition.

The District Court, moreover, did not err in failing to narrow discovery on its own initiative. Although the Court cites *United States* v. *Poindexter*, 727 F. Supp. 1501 (DC 1989), as "sound precedent" for district-court narrowing of

discovery, see *ante*, at 390, the target of the subpoena in that case, former President Reagan, unlike petitioners in this case, affirmatively requested such narrowing, 727 F. Supp., at 1503. A district court is not subject to criticism if it awaits a party's motion before tightening the scope of discovery; certainly, that court makes no "clear and indisputable" error in adhering to the principle of party initiation, *Kerr*, 426 U. S., at 403 (internal quotation marks omitted).[8]

---

[8] The Court also questions the District Court's invocation of the federal mandamus statute, 28 U. S. C. § 1361, which provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." See *ante*, at 390–391; 219 F. Supp. 2d, at 41–44. See also *Chandler* v. *Judicial Council of Tenth Circuit*, 398 U. S. 74, 87–89, and n. 8 (1970) (holding mandamus under the All Writs Act, 28 U. S. C. § 1651, improper, but expressing no opinion on relief under the federal mandamus statute, § 1361). On the question whether § 1361 allows enforcement of the FACA against the Vice President, the District Court concluded it "would be premature and inappropriate to determine whether the relief of mandamus will or will not issue." 219 F. Supp. 2d, at 44. The Government, moreover, contested the propriety of § 1361 relief only in passing in its petition to the appeals court for § 1651 mandamus relief. See App. 363–364 (Government asserted in its mandamus petition: "The more general writ of mandamus cannot be used to circumvent . . . limits on the provision directly providing for review of administrative action."). A question not decided by the District Court, and barely raised in a petition for mandamus, hardly qualifies as grounds for "drastic and extraordinary" mandamus relief, *Ex parte Fahey*, 332 U. S. 258, 259–260 (1947).

JUSTICE THOMAS urges that respondents cannot obtain § 1361 relief if "wide-ranging discovery [is needed] to prove that they have *any* right to relief." *Ante*, at 395 (opinion concurring in part and dissenting in part) (emphasis in original). First, as the Court of Appeals recognized, see *supra*, at 402–403; *infra*, at 405, should the Government so move, the District Court could contain discovery so that it would not be "wide-ranging." Second, all agree that an applicant seeking a § 1361 mandamus writ must show that "the [federal] defendant owes him a clear *nondiscretionary* duty." *Heckler* v. *Ringer*, 466 U. S. 602, 616 (1984) (emphasis added). No § 1361 writ may issue, in other words, when federal law grants discretion to the federal officer, rather than imposing a duty on him. When federal law imposes an obligation, however, suit under § 1361

Review by mandamus at this stage of the proceedings would be at least comprehensible as a means to test the Government's position that *no* discovery is appropriate in this litigation. See Brief for Petitioners 45 ("[P]etitioners' separation-of-powers arguments are . . . in the nature of a claim of immunity from discovery."). But in remanding for consideration of discovery-tailoring measures, the Court apparently rejects that no-discovery position. Otherwise, a remand based on the overbreadth of the discovery requests would make no sense. Nothing in the record, however, intimates lower court refusal to reduce discovery. Indeed, the appeals court has already suggested tailored discovery that would avoid "effectively prejudg[ing] the merits of respondents' claim," *ante,* at 393 (STEVENS, J., concurring). See 334 F. 3d, at 1106 (respondents "need only documents referring to the involvement of non-federal officials"). See also *ante,* at 393, n. (STEVENS, J., concurring) ("A few interrogatories or depositions might have determined . . . whether any non-Government employees voted on NEPDG recommendations or drafted portions of the committee's report"). In accord with the Court of Appeals, I am "confident that [were it moved to do so] the district court here [would] protect petitioners' legitimate interests and keep discovery within appropriate limits." 334 F. 3d, at 1107.[9] I would therefore affirm the judgment of the Court of Appeals.

---

is not precluded simply because facts must be developed to ascertain whether a federal command has been dishonored. Congress enacted § 1361 to "mak[e] it more convenient for aggrieved persons to file actions in the nature of mandamus," *Stafford* v. *Briggs,* 444 U. S. 527, 535 (1980), not to address the rare instance in which a federal defendant, upon whom the law unequivocally places an obligation, concedes his failure to measure up to that obligation.

[9] While I agree with the Court that an interlocutory appeal may become appropriate at some later juncture in this litigation, see *ante,* at 391, I note that the decision whether to allow such an appeal lies in the first instance in the District Court's sound discretion, see 28 U. S. C. § 1292(b); *supra,* at 398, n. 3.