In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3898

IN RE PETITION OF BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., and BOEHRINGER INGELHEIM INTERNATIONAL GMBH, IN PRADAXA (DABIGATRAN ETEXILATE) PRODUCTS LIABILITY LITIGATION.

Petition for a Writ of Mandamus to the
United States District Court for the Southern District of Illinois.
No. 3:12-md-02385-DRH-SCW — **David R. Herndon**, *Chief Judge*.

SUBMITTED JANUARY 17, 2014 — DECIDED JANUARY 24, 2014

Before POSNER, SYKES, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. Pradaxa is a prescription blood-thinning drug manufactured by an American company and its German affiliate (collectively Boehringer). A number of suits against Boehringer complaining about the accuracy of the warning label on the drug have been consolidated in the Southern District of Illinois for pretrial proceedings. The litigation is in the discovery stage. On December 9 of the just-ended year, the district judge presiding over the litigation imposed sanctions on Boehringer for discovery abuse.

Boehringer has petitioned us for a writ of mandamus quashing the sanctions.

The sanctions include fines, totaling almost $1 million, that the judge imposed for various abuses; this part of his order is not so questionable (if it is questionable at all) as to be a plausible candidate for mandamus. But in addition he imposed a nonmonetary sanction that is deeply troubling. It relates to depositions that the plaintiffs' counsel wants (and is entitled) to take of 13 employees of Boehringer, all of whom work in Germany and 10 of whom are German citizens (the other three are U.S. citizens). The parties had agreed that the depositions of these 13 potential witnesses would be conducted in Amsterdam. But when the plaintiffs asked the district judge to impose sanctions on Boehringer for discovery abuses, one of the sanctions they asked for was (we quote the judge) that the site of the depositions be changed to "a place convenient to the [plaintiffs] and [to] the defendants' [Boehringer's] United States counsel. This is a financial issue but also a timing issue because of the many delays caused by the defendants['] actions and the extraordinary time it takes to fly to Amsterdam and the logistics of setting up the necessary working space there." Because of what the judge found (and we do not take issue with his finding) to be Boehringer's interminable discovery delays, the judge determined "an appropriate sanction pursuant to [his] inherent powers to be to require [Boehringer] to produce all employees for deposition in the United States," either "in New York City or such other place as the [plaintiffs] and the defendants shall *unanimously* agree upon" (emphasis added). Obviously the plaintiffs will not agree either to a European locus for the depositions, or to any place in the Unit-

ed States that Boehringer might prefer to New York City. So New York (in all likeilihood) it will be.

A federal judge is empowered to subpoena a U.S. citizen living abroad to appear before him and be deposed, but only if the citizen's testimony can't be obtained in admissible form otherwise, 28 U.S.C. § 1783(a)—and here it can be, by a deposition conducted in Amsterdam. So that statute was not authority for what the judge did, even with regard to Boehringer's U.S. citizen employees in Germany. And foreigners who are not in the United States are beyond the subpoena power of our courts even if their testimony can't be obtained in admissible form otherwise. *Relational, LLC v. Hodges*, 627 F.3d 668, 673 (7th Cir. 2010) ("foreign nationals are beyond the court's subpoena power"); *United States v. Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993). There is a possible exception, but it is immaterial: Fed. R. Civ. P 30(b)(6) provides that "a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more *officers, directors, or managing agents, or designate other persons who consent to testify on its behalf*" (emphasis added). If it be assumed that the rule is applicable to a foreign corporation whose officers, etc., are all foreigners, still the passage we've italicized indicates that only certain types of individual may be designated to testify at such a deposition, and there is no suggestion that any of the 13 persons whom the district judge in this case has ordered be deposed in the United States fit any of the categories. Finally, nothing in Fed. R. Civ. P. 37, the source of judicial power to impose sanctions for disobeying a discovery order, and the stated ground of

the sanctions order in this case, purports to enlarge judicial power to impose such orders against foreigners.

It's true that the order changing the location of the depositions is addressed to Boehringer rather than to the 13 witnesses—Boehringer is "require[d]" to produce them for deposition in the United States (since, armed with the judge's order, the plaintiffs will not consent to depose them elsewhere). But what if the witnesses refuse? They are not parties. They can't be forced to come to the United States to be deposed. And is using an employer's leverage over his employees a proper means of circumventing limitations on deposing persons in foreign countries (including U.S. citizens, if they can be deposed satisfactorily in the foreign country they're residing in, or, as in this case, in a neighboring country).

The plaintiffs ask: since Boehringer was willing to allow its employees to be deposed outside Germany, why should it object to their being deposed in another foreign country, the United States? Well, we don't know where in Germany all 13 employees live or work, but Amsterdam is only 265 miles from Ingelheim, the headquarters of Boehringer's German affiliate, while New York City is 3,830 miles from Ingelheim.

But finally we have difficulty understanding the order to change the site of the depositions as a *sanction*. The parties were all set to conduct the depositions in Amsterdam. Suppose that because of unjustifiable delay, Boehringer has made it more costly for the plaintiffs to conduct discovery there—maybe the plaintiffs bought nonrefundable plane tickets which they couldn't use because Boehringer postponed the depositions. Certainly the judge could make

Boehringer pay for the tickets, or for any other unreasonable expense that it imposed on the plaintiffs relating to the scheduled depositions; Boehringer is a huge pharmaceuticals enterprise. The problem is the *form* the sanction ordered by the judge took—ordering Boehringer to be the court's agent in violating federal legal limitations on compelled discovery in foreign countries, merely so that depositions could be shifted to a place inconvenient for the witnesses who are to be deposed. They are to be punished for the sins of their employer. And they are not even corporate bigwigs, who might feel humiliated by a travel order; so far as appears, they are merely research scientists. They are not responsible for Boehringer's contumacy, yet they are the targets of the sanction.

And suppose Boehringer complains to the German government, or for that matter the U.S. State Department, that the judge's order is *ultra vires* and infringes German sovereignty. Do we need that?

We conclude that the district judge exceeded his authority in ordering the location of the depositions changed to punish Boehringer. And when a discovery order "amount[s] to a judicial usurpation of power or a clear abuse of discretion," *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367, 371 (2004) (citations and quotation marks omitted), or otherwise works a manifest injustice, a party may petition the court of appeals for a writ of mandamus. Although the Supreme Court has refused to include discovery orders within the class of "collateral orders," which are appealable though interlocutory, see, e.g., *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 103 (2009), it has made clear that mandamus provides a "safety valve" ena-

bling appellate review of such an order in the exceptional case. *Id*. at 111; see *Ott v. City of Milwaukee*, 682 F.3d 552, 554–55 (7th Cir. 2012). This is one of those rare "safety valve" cases for mandamus because of the risk of international complications arising from a U.S. judge's having ordered foreigners to be brought to the United States to be deposed, when there is no legal authority for such an order; because alternative sanctions are readily available; and because the particular sanction punishes innocents—the inventors whom the order requires Boehringer to fly to the United States to be deposed, rather than their being deposed in nearby Amsterdam as the parties had agreed.

We therefore direct that the order be rescinded; in all other respects the petition for a writ of mandamus is denied.

HAMILTON, *Circuit Judge, dissenting.* Petitioners are not entitled to any mandamus relief from the portion of the district court's sanctions order requiring them to produce thirteen employees based in Germany for depositions in the United States. The writ is being misused here to obtain immediate appellate review of an interlocutory discovery sanction. The defendant-petitioners even admit as much. They have told us they filed for the writ because they were simply unwilling to annoy the district judge further by inviting an appealable contempt sanction.

On the merits, the defendant-petitioners have failed to show a clear and undisputable right to the writ. The district judge ordered a foreign corporation to produce its witnesses for depositions in the United States not as a matter of routine case management, but as a well-aimed sanction for repeated, bad-faith discovery abuses. No authority teaches that the sanction was even unreasonable, let alone unauthorized.

In fact, when properly understood, the district court's sanction was superbly tailored to solve the problem the court faced. The defendant-petitioners had built a lengthy record of discovery abuses and failures showing that they and their lawyers were not taking the district court's orders or their discovery obligations seriously. The order moving depositions from Amsterdam to New York was targeted to get the personal attention of the executives and lawyers, yet without affecting the merits of the litigation. For these reasons, explained in detail below, I respectfully dissent.

No member of the panel disagrees, however, with the district court's finding of bad faith or with the imposition of substantial monetary sanctions. The district court was planning to revisit the issue of sanctions in any event. After the writ

issues, the district court will need to revise its package of sanctions. At that point, frankly, the petitioner-defendants may regret the issuance of the writ. Many other sanctions are available to the district court to serve the same purposes—to compensate plaintiffs for wasted time and money, and to show the defendants, their lawyers, and their senior executives that they need to respect the litigation, the court, and their discovery obligations, and they need to comply with court orders and even their own promises to the court. Other sanctions that the district court should consider may have much more serious consequences for the litigation than the cost and inconvenience of some transatlantic flights.

I.  *Mandamus is Not Necessary*

Myriad cases teach that discovery orders, including sanctions, simply are not immediately appealable. Appellate review must await a final judgment. See, *e.g.*, *Reise v. Board of Regents*, 957 F.2d 293, 295 (7th Cir. 1992). A party who believes a district court has made a serious mistake has the option of refusing, respectfully, to comply with the court order. A sanction of contempt or a default judgment or dismissal can then be appealed. *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 110–11 (2009); *Marrese v. American Academy of Orthopaedic Surgeons*, 706 F.2d 1488, 1492–93 (7th Cir. 1983). Mandamus may be an option, but only in extraordinary cases, and only where there is no other adequate remedy and the petitioner's right is clear and undisputable. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988); *Kerr v. United States District Court*, 426 U.S. 394, 402 (1976) (denying mandamus); *Powers v. Chicago Transit Auth.*, 846 F.2d 1139, 1142–43 (7th Cir. 1988) (dismissing appeal and denying mandamus).

The extraordinary thing in this case is that the petitioners themselves recognize these alternatives, but they just seem too weak-kneed to use them. They explain in note 6 of their petition that they do not want to refuse to comply with the order because they respect the court and because they do not want "to further jeopardize their interactions with the [district] court by willfully disregarding its order."

We should not enable this approach to litigation. With all due respect, this is a major league discovery dispute in high-stakes international litigation. Refusing to comply with a discovery order you believe is unlawful *is* the respectful course and the orderly procedure. *E.g.*, *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 32 F.3d 1175, 1179 (7th Cir. 1994) (dismissing appeal of discovery order where party failed to take that step). Refusal is a serious step that makes a party think hard about how important the issue is and how confident it is in its position. See, *e.g.*, *Ott v. City of Milwaukee*, 682 F.3d 552, 555 (7th Cir. 2012) ("The adversely affected party is expected to put its money where its mouth is, so to speak, before an appeal will be heard."); *Reise*, 957 F.2d at 295–96.

Judges understand that the option of refusal and contempt is available for a party that is truly serious about wanting prompt appellate review of a discovery order. Taking this option does not indicate the kind of lack of respect that these defendants had been showing prior to the second sanctions order. The petition should be rejected on procedural grounds alone. We need not and should not enable the use of mandamus as an alternative, thereby inviting far too many interlocutory appellate reviews of discovery orders.

II. *No Clear and Undisputable Right*

Even if a writ of mandamus were the only path to meaningful appellate review, the writ should not issue unless the petitioner could show a "clear and undisputable right" to the writ. *Cheney v. United States District Court*, 542 U.S. 367, 380–81 (2004); *Kerr*, 426 U.S. at 402; *In re Whirlpool Corp.*, 597 F.3d 858, 860 (7th Cir. 2010). That standard has not been met here. No one has cited applicable authority indicating that the sanction was *not* authorized. In fact, the district court used its sanction power to take only a small step beyond its ordinary case management powers.

As a general rule, of course, a federal court has no power to subpoena non-citizens who are outside the United States. *Relational, LLC v. Hodges*, 627 F.3d 668, 673 (7th Cir. 2010). (Subpoenas can reach U.S. citizens abroad under 28 U.S.C. §1783.) The deponents in question here have not yet been shown to be directors, officers, or managing agents subject to direct deposition notices and the court's discretionary power over the locations of depositions. So the district court's order on the location of these depositions would not have been authorized other than as a discovery sanction.

Yet even without discovery sanctions, district courts managing civil cases have extensive discretion over the locations of depositions. Numerous cases hold that a federal court may order a deponent designated under Rule 30(b)(6) to appear for the deposition in the forum district even if the deponent is a foreign citizen and resident. See, *e.g., New Medium Technologies LLC v. Barco N.V.*, 242 F.R.D. 460 (N.D. Ill. 2007) (Cole, M.J.); *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 629–30 (C.D. Cal. 2005); *In re Vitamin Antitrust Litig.*, 2001 WL 35814436 (D.D.C. Sept. 11, 2001); *Custom Form Mfg., Inc. v. Omron Corp.*, 196 F.R.D. 333, 335–36 (N.D. Ind. 2000) (collecting

cases); *M&C Corp. v. Erwin Behr GmbH & Co.*, 165 F.R.D. 65, 68 (E.D. Mich. 1996); *Roberts v. Heim*, 130 F.R.D. 430, 439–40 (N.D. Cal. 1990). Extensive persuasive authority holds that a court may order a foreign defendant's officers, directors, or managing agents to appear for depositions in the United States. See *In re Honda American Motor Co. Dealership Relations Litig.*, 168 F.R.D. 535, 541–42 (D. Md. 1996) (Motz, J.); see also *Angiodynamics, Inc. v. Biolitec AG*, — F. Supp. 2d —, 2014 WL 129035 (D. Mass. Jan. 14, 2014) (entering default against defendant who refused to present managing director in United States for deposition); *Peerless Industries, Inc. v. Crimson AV, LLC*, 2013 WL 85378, at *2 (N.D. Ill. Jan. 8, 2013); *Schindler Elevator Corp. v. Otis Elevator Co.*, 657 F. Supp. 2d 525, 529–30 (D.N.J. 2009); *Triple Crown America, Inc. v. Biosynth AG*, 1998 WL 227886, at *4 (E.D. Pa. April 30, 1998).

As further evidence that the issue here is at least debatable even absent the record supporting sanctions, see the divided panel's opinions in *Rosenruist–Gestao E Services LDA v. Virgin Enterprises Ltd.*, 511 F.3d 437, 445–46 (4th Cir. 2007), in which the Fourth Circuit held that a foreign applicant for a United States trademark could be ordered to produce a witness for a Rule 30(b)(6) deposition in the United States. And in the context of discovery sanctions, where the district court's power is greater and more flexible, the Second Circuit has affirmed dismissal as a sanction against foreign plaintiffs who refused to produce their common manager for a deposition in the United States. *Republic of the Philippines v. Marcos*, 888 F.2d 954, 956–57 (2d Cir. 1989).

The district court here went a step further, of course, by applying a similar order to deponents chosen by the opposing parties rather than under Rule 30(b)(6), and who apparently are not directors, officers, or managing agents of defendants.

There is no explicit authority for the sanction order, but there is also no authority against it. Given the district court's broad powers to impose much more draconian discovery sanctions under Rule 37, this much milder sanction should be within the court's power, and certainly not so far out of bounds as to justify a writ of mandamus.

The sanction is an order directed to parties over whom the court has jurisdiction. Those parties have repeatedly acted in bad faith and refused to comply with their obligations to preserve documents and to produce them in discovery. Those parties, in turn, have the power as employers to order selected employees to travel to the United States for depositions.

There is no reason for this court to have qualms about whether the defendants can or will order their employees to comply with the district court's sanctions order. Courts routinely issue orders to corporate parties that require them to order their employees to do things they might prefer not to do, such as appear for a deposition, answer interrogatories, or search for documents for discovery. Nor is there anything unusual about having these defendants order an employee to travel across an international border, whether for meetings or for depositions. These defendants are part of a global pharmaceutical enterprise. Their employees travel across international borders all the time. See, *e.g.*, *New Medium Technologies*, 242 F.R.D. at 468 (rejecting undue burden arguments by noting how often foreign deponents traveled to United States on business). If the employees refused such travel, they could be subject to discipline up to and including the loss of their jobs. And in this case, the defendants already agreed to produce their Germany-based employees for depositions in Amsterdam or London. In making that agreement, the defendants surely

believed they had the power to order any reluctant employees to make that trip.

Along these lines, *Minebea Co. v. Papst*, 370 F. Supp. 2d 302, 309–10 (D.D.C. 2005), is persuasive and almost directly on point. Foreign inventors in that case had agreed in a contract assigning their inventions to the defendant to testify in court proceedings at its request. Judge Friedman ordered the defendant to use its contractual rights to ensure that the inventors appeared in the United States for trial, particularly against a background of discovery abuses and delays. The judge knew he could not directly order the foreign inventors to appear, but he could order the defendant, over whom he did have jurisdiction, to use its contractual rights to ensure their appearance. The order was backed up by the threat of inviting the jury to draw adverse inferences against the defendant if the foreign inventors failed to appear. Judge Friedman's order is thus quite similar to what the district ordered here.

The defendants got this court's attention by arguing that the district court's order would evade and possibly violate agreements between the United States and German governments. That argument was guaranteed to get our attention, but it's a red herring.

As noted, the defendants agreed at the beginning of the case to have their German employees travel to Amsterdam or London for depositions.[1] Whatever the effects of the

---

[1] The Amsterdam/London option was practical and in every party's interest. If depositions are taken in Germany under the Federal Rules of Civil Procedure, they must be taken in just one particular room in the United States Consulate in Frankfurt am Main that will hold only ten people. The parties must provide at least six weeks' notice, and prior

(continued...)

U.S.–German agreements might be, these defendants assured the district court that they were willing to *order their employees to travel across international borders for depositions*. Now the district court has ordered defendants to order the employees to travel to New York instead of Amsterdam. The difference between Amsterdam and New York is substantial in terms of miles and hours, but not in terms of sovereignty, international comity, or employer-employee relationships. The difference is certainly not so legally significant as to warrant a writ of mandamus.

III.   *The Well-Tempered Sanction*

A.   *The Defendants' Record of Discovery Failures*

In his second order imposing sanctions, Chief Judge Herndon explained in detail how the defendants have repeatedly shown their disrespect for the litigation, the court and its orders, and their discovery obligations. See *In re Pradaxa (Dabigatran Etexilate) Products Liability Litig.*, 2013 WL 6486921 (S.D. Ill. Dec. 9, 2013) (Case Management Order 50). He reviewed the long history of problems with defendants' discovery in this matter, including counsel's confident assur-

---

[1] (...continued)
approval by the German Ministry of Justice is required. Once the deposition is scheduled, the hours are restricted and electronic devices are not permitted (though a pay telephone is available in the public waiting room). See Federal Republic of Germany, Judicial Assistance: Taking of Evidence, Agreements effected by exchange of notes, 32 U.S.T. 4181; Consulate General of the United States, *General Information About Depositions in Frankfurt*, available at http://germany.usembassy.gov/english-speaking-services/2008-deposition-instructions.pdf (last visited Jan. 21, 2014). Taking depositions in Germany would reward defendants for their pattern of discovery abuses in this case with more delay and severely restricted oversight by the district court.

ances to the court at the beginning of the case that a complete litigation "hold" was in place company-wide to preserve relevant documents. He reviewed the many problems and excuses offered that led him to impose tighter control over discovery process without imposing sanctions, as part of his Case Management Order 38, issued July 10, 2013. *Id*. at *2–3.

Judge Herndon then reviewed his first sanctions order issued on September 18, 2013 in the face of continued failures to comply with the court's discovery orders. That first order imposed relatively mild sanctions but warned that continued failures would draw much more serious sanctions. *Id.* at *3–5. He then turned to the subjects of plaintiffs' second motion for sanctions. His account of the defendants' numerous and inexcusable failures and their disingenuous arguments to justify them is thorough and compelling.

First, for example, defendants failed to take the obvious step of preserving documents in the control of Dr. Thorsten Lehr, who played a key role in developing and testing Pradaxa. Dr. Lehr left the defendants' employ in September 2012, several months after the MDL had been established and after defense counsel had assured the court and plaintiffs that they had a complete litigation hold in place. Yet defendants told the court they chose not to preserve the documents in Dr. Lehr's custody because, at the time of his departure in September 2012, he had not been identified as a custodian of relevant documents. That failure was simply inexcusable. Judge Herndon explained that defendants could not credibly contend they did not know Dr. Lehr's files contained relevant information. *Id*. at *10. He was the defendants' expert on Pradaxa. His work had been reviewed at the highest levels of the company. *Id*. at *10–12.

Defendants also tried to justify their failure by arguing that when Dr. Lehr left in September 2012, plaintiffs had not yet

identified him as a person of interest. Judge Herndon correctly rejected this position as "nonsense." *Id*. at *12. The purpose of the duty to preserve is to protect relevant information so it will be available when and if requested by an opposing party. In September 2012, defendants were in a far better position than plaintiffs to understand how important Dr. Lehr and his files would be. In further nonsense from the defendants, moreover, they tried to excuse their failures by arguing that because their preservation obligation was first triggered in February 2012, they were under no duty to produce documents created before February 2012. *Id.* at 13. Under that theory, a party who knows it is likely to be sued would be entitled to shred or erase every relevant document created up until the time it learned of the planned lawsuit. Enough said on that.

Second, defendants also failed to impose a litigation hold on documents of all sales representatives, clinical science consultants (CSCs) and medical science liaisons (MSLs) until August 2013. The explanation was that they did not understand the scope of the litigation until then. More than a year earlier, however, defendants themselves had persuaded the Judicial Panel on Multidistrict Litigation to establish the Pradaxa MDL because the litigation was nationwide. *Id.* at *7 and *15. Judge Herndon was "amazed" by the new argument, as I am. The defendants also sought to justify their failure by saying they had imposed a unilateral "proportionality" test on the litigation hold. That was inconsistent with what they had been telling the court and the plaintiffs for more than a year. Judge Herndon described it accurately as a desperate "post-debacle" argument. *Id.* at *15.

Even more striking, defendants claimed their failures would not prejudice plaintiffs because sales representatives, CSCs, and MSLs had been instructed not to use material outside an authorized database when selling Pradaxa, and the authorized material had been produced. Judge Herndon

mildly described this argument as "ridiculous." *Id*. I would add "dishonest" and "insulting" to describe this notion that the plaintiffs should just take on faith defendants' assurances that hundreds or thousands of representatives always complied with their instructions when trying to promote the drug. I doubt, for example, that defendants are just taking on faith the plaintiffs' testimony supporting their claims.

Judge Herndon then reviewed defendants' failures to produce documents from an important shared computer drive known as the "G Drive," which contained millions of potentially relevant documents. Long after defendants had shown repeated failures to comply with discovery obligations, defendants information technology staff gave authority to a third-party vendor handling discovery to access the G Drive. But defendants gave the vendor only minimal access, with generic passwords that failed to provide access to a large fraction of the G Drive with more sensitive documents. Judge Herndon reasonably said that if such a mistake had occurred at the beginning of the case, he could have understood it. At this late stage, though, it was reasonable to infer bad faith. *Id*. at \*16.

Finally, Judge Herndon reviewed defendants' failure to impose a litigation hold on employees' text messages until mid-October 2013, which was long after serious problems with the scope of the litigation hold had surfaced, and even after the first sanctions order had been issued. *Id.* at \*17. Defendants' arguments to justify their failure were as dishonest and ridiculous as those offered to justify other failures. Text messages were not relevant, they said, though they had instructed employees to use text messages for business purposes. We didn't know text messages were covered by the litigation hold or the discovery requests, they said, yet the scope of the requests was plainly broad enough, and defendants themselves were seeking text messages from plaintiffs.

Yes, we failed to disable the auto-delete function on company-owned cell phones, but that would have been too burdensome. As Judge Herndon explained, if defendants thought the hold would be too burdensome, they had an obligation to raise the problem with the court. They were not entitled to make a unilateral decision that ensured the destruction of relevant documents. *Id.* at *17–18. In light of the cumulative effect of the defendants' repeated and serious failures, the district court's inferences of bad faith were reasonable and well supported.

B. *The Package of Sanctions*

When Judge Herndon had to decide the second set of sanctions, he faced an important and delicate problem. The defendants simply were not complying with his orders and their discovery obligations. At the same time, given the stakes in the litigation and courts' general preference for deciding cases on their merits rather than through discovery sanctions, he was reluctant to use the most powerful sanctions he could impose. Those could directly affect the outcome of the lawsuits.

The first set of sanctions had not been sufficient to convince defendants and their counsel to make serious efforts to comply with the court's orders and their obligations, or to compensate plaintiffs for the prejudice they experienced. The second set of sanctions was measured and well-tempered. The financial consequences went from $30,000 in the first order to nearly $1 million in the second, plus plaintiffs' fees and costs tied to the motion. The judge also ordered defendants to make immediate and complete disclosures of the extent of their failures and to produce what they could retrieve from the omitted materials. He also made clear that he would make a final decision about additional sanctions after receiving such disclosures. *Id.* at *19–20. And of course, he ordered thirteen depositions moved from Amsterdam to New York.

As we evaluate that last sanction, the important thing to keep in mind is that Rule 37 authorizes discovery sanctions that can have devastating effects on a party's position in the litigation. They include striking portions of pleadings, such as specific defenses or claims, or declaring that certain issues will be determined against the party as a sanction. The most serious against a defendant is entry of default judgment. See Fed. R. Civ. P. 37(b)(2)(A), (b)(2)(B), (c)(1)(C), and (d)(3).

The portion of the sanctions order changing the location of the depositions from Amsterdam to New York was a careful and temperate stroke by a veteran judge experienced in the challenges of multi-district litigation. Changing the location would have no effect on the merits of the litigation. Yet it would get the very personal attention of the deponents and senior management, as well as their lawyers. The lawyers would have to explain to their clients why they would need to have the deponents take the extra time to fly to New York instead of Amsterdam. The correct explanation would have to be because those involved—counsel and clients together—had been failing to respect the court and its orders.

The explanation would also include a warning that if their conduct continued, they could simply lose the lawsuits, regardless of their defense on the merits. The sanction would also provide a form of compensation to plaintiffs, whose counsel have had to spend an inordinate amount of time dealing with defendants' delays, malfeasance, and nonfeasance in discovery. The writ of mandamus mistakenly deprives the district court of one useful tool. But the court will have plenty of other tools available when it revisits the second sanction order to decide on the complete package.[2]

---

[2]   Even if the district court had not planned to return to the topic of sanctions after defendants made further disclosures, the second sanctions

(continued...)

For example, the monetary sanctions imposed thus far seem not to have had much effect. (The non-monetary sanction regarding deposition locations seems so well-aimed because it will affect counsel and witnesses personally.) But there surely are levels at which monetary sanctions will get these defendants' attention, punish the defendants, and compensate the plaintiffs. The district court retains the power to find those levels, proportional to the failings. See generally *Salgado v. General Motors Corp.*, 150 F.3d 735, 740 (7th Cir. 1998) (discovery sanctions must be proportionate; affirming dismissal as discovery sanction).

The district court will also act well within its discretion if it decides instead to impose some other non-monetary sanctions authorized by Rule 37, even if they might directly affect the merits of the litigation. A revised package of sanctions designed to be at least as effective as the entire package in the second sanctions order may leave defendants wishing they had just complied with the order to do some depositions in New York.

---

[2] (...continued)
order put together a package of sanctions, just as a criminal sentence can package several different sanctions for intended effects. When appellate review removes one piece from a sentencing package, the usual effect of the remand is to let the district court revisit the entire package. See, *e.g.*, *United States v. White*, 406 F.3d 827, 831–33 (7th Cir. 2005) (collecting cases and explaining practice); *United States v. Smith*, 103 F.3d 531, 534–35 (7th Cir. 1996); *United States v. Shue*, 825 F.2d 1111, 1113–14 (7th Cir. 1987), quoting *United States v. DiFrancesco*, 449 U.S. 117, 135 (1980) ("The Constitution does not require that sentencing should be a game in which a wrong move by the judge means immunity for the prisoner."). The district court should revisit the entire package now that this relatively mild sanction about deposition location has been removed.