# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-40289

In re: MARCO A. RAMIREZ,

Petitioner

United States Court of Appeals
Fifth Circuit

**FILED**

March 30, 2015

Lyle W. Cayce
Clerk

Petition for Writ of Mandamus to the United States District Court
for the Southern District of Texas
USDC No. 7:13-CV-531

Before DAVIS, CLEMENT, and COSTA, Circuit Judges.

PER CURIAM:*

The district court held Marco Ramirez in civil contempt for failing to comply with a turnover order. He filed a petition for writ of mandamus, requesting that we overturn the contempt order. We DENY his petition.

## FACTS AND PROCEEDINGS

The Securities and Exchange Commission filed a civil lawsuit against Ramirez, alleging securities fraud. Ramirez and his wife had formed a company called USA Now, a regional center for the EB-5 program. The EB-5 program gives visas and paths to citizenship to foreigners who invest $500,000 in businesses that create jobs. Ramirez would solicit money from potential candidates for the EB-5 program, promising to invest it in projects that

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

qualified for the program. He would also promise to hold the investments in escrow until the EB-5 visas were approved. In fact, he would allegedly immediately spend the money or transfer it to his other businesses. He would also promise a return on investment, even though such a return was incompatible with receiving an EB-5 visa.

The district court granted the SEC's ex parte motion for a temporary restraining order and a receivership order. This receivership order required Ramirez and his wife to provide an accounting and turn over all of their assets to a receiver. Ramirez and the SEC later agreed to a preliminary injunction that froze his assets, kept the receivership order in place, and stayed the other proceedings pending a criminal investigation.

The receiver's accountant submitted a preliminary report almost a year later. The report noted that $500,000 seemed to be missing from the estate. In particular, the report stated:

> There is one contribution made by one of the early investors[, "Ms. Gonzalez,"] that warrants special comment. We found a check for $500,000 issued as a refund to an investor on October 14, 2011. We had no record of and could find no record of this investor ever having made an investment of $500,000 into any of the bank accounts of the USA Now companies. The mystery of what had happened to this $500,000 was solved by a memo written by Marco Ramirez where he detailed his interactions with several of the investors. In his memo Marco Ramirez details this particular investor. According to Mr. Ramirez'[s] memo the $500,000 was delivered in a Dillard's bag in cash to Marco Ramirez at his office. Our review of the bank records do not show this amount of cash ever being deposited into any of the bank accounts that we reviewed. It may be in the Unknown Deposits but until we can determine that the $500,000 cash was actually deposited into one of the USA Now companies' accounts, we are showing that it went to Marco Ramirez.

Based upon this report, the district court issued a turnover order that required Ramirez to return the $500,000 to the receiver because it was properly part of

the estate. The district court also issued an order to show cause why Ramirez should not be held in contempt if he did not turn over the asset.

Ramirez declined to turn over the asset or reveal where it had gone, and he has continued to do so to this day. At the show cause hearing, the receiver's accountant testified consistently with his report. The court also admitted into evidence various different versions of the note that described Ramirez receiving a Dillard's bag full of cash. The district court held Ramirez in contempt, and he spent 30 days in jail. He attempted to appeal, but a panel of this court dismissed the appeal because the contempt order was interlocutory. *See* Appeal No. 14-41087, Doc. 45 (per curiam). He then filed a petition for writ of mandamus, which a panel of this court denied because a motion for reconsideration was still pending with the district court, meaning that an alternative means for relief was still available. *See* Appeal No. 14-41312, Doc. 13 (per curiam). The panel noted, though, that "the district court's conduct in this case raises troubling implications for Ramirez's Fifth Amendment privilege against self-incrimination and right to due process."[1] *Id.*, slip op. at 4.

The district court then held an additional evidentiary hearing to give Ramirez the chance to purge his contempt. This hearing also cleared up some evidentiary issues. The district court again held Ramirez in contempt but stayed the order until this court could rule on his petition for writ of mandamus.

## DISCUSSION

Mandamus is an extraordinary remedy. It is available only if (1) there is "no other adequate means to attain the relief" sought; (2) "the petitioner . . .

---

[1] As discussed below, on closer analysis, we hold that the district court's conduct has been appropriate.

satisf[ies] the burden of showing that his right to issuance of the writ is clear and indisputable"; and (3) "the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–81 (2004) (internal quotation marks and alteration omitted).

The parties do not dispute that the first prong is met here. Ramirez raises three arguments relating to the other two prongs. Each lacks merit.

## A. The District Court's Turnover Order is Supported by Clear and Convincing Evidence

Ramirez does not dispute that he failed to comply with the turnover order. Instead, he attacks the turnover order itself. Attacking the underlying order is appropriate in a mandamus case, for "[i]t is a well established principle that an order of civil contempt cannot stand if the underlying order on which it is based is invalid." *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1356 (5th Cir. 1978).

Turnover orders in bankruptcy cases can only be issued based on clear and convincing evidence. *See, e.g.*, *Oriel v. Russell*, 278 U.S. 358, 362 (1929). The Supreme Court's rationale for requiring the clear-and-convincing evidence standard is that:

> The charge upon which the order is asked is that the bankrupt, having possession of property which he knew should have been delivered by him to the trustees, refuses to comply with his obligation in this regard. It is a charge equivalent to one of fraud, and must be established by the same kind of evidence required in a case of fraud in a court of equity. A mere preponderance of evidence in such a case is not enough. The proceeding is one in which coercive methods by imprisonment are probable and are foreshadowed.

4

*Id.* at 362–63. The exact same logic applies to a turnover order in an SEC receivership case. Therefore, we apply that standard here.[2]

We can grant the writ of mandamus only if it is "clear and indisputable" that the district court could not have issued the turnover order under the clear and convincing evidence standard. *See Cheney*, 542 U.S. at 381 ("[The] right to issuance of the writ [must be] clear and indisputable."). In light of the subsequent evidentiary hearings, the district court was entitled to issue the turnover order under this standard. At the hearings, it was essentially undisputed that USA Now had issued a refund check for $500,000 to "Ms. Gonzalez" in October 2011, even though there was no record of her ever having made a deposit. The refund check was instead paid from the funds provided by another investor (in a Ponzi-scheme-like fashion).

The question then became whether Ramirez ever received the $500,000 from Ms. Gonzalez and, if so, whether the money was still in Ramirez's estate at the time the receivership came into being in September 2013. The district court received strong evidence that the money had entered Ramirez's estate sometime before October 2011. The receiver found notes in Ramirez's office and on his computers that stated he had received a Dillard's bag from Ms. Gonzalez containing $500,000 in cash. While there was no evidence about who had written these notes, the fact that they were written in the first person and were found in Ramirez's office and on his computers gave rise to the reasonable inference that they were written by Ramirez. The receiver also produced an escrow agreement from Ms. Gonzalez, providing that she would invest $500,000 with USA Now. Finally, the receiver produced an email from

---

[2] The district court's second contempt order properly applied the clear-and-convincing evidence standard when making the factual findings necessary for the turnover order. That is, the district court found "by clear and convincing evidence that Defendant, at the time of both of the Court's prior orders and continuing to the present, had and has possession of the $500,000.00 cash . . . ."

Ramirez to (remarkably) an FBI agent, to which Ramirez attached a demand letter from Ms. Gonzalez's attorney for the return of $500,000 and a response letter from Ramirez that did not deny that he had received Ms. Gonzalez's investment. All of this evidence clearly supports a finding that Ramirez received a $500,000 cash investment from Ms. Gonzalez.

The next question was whether Ramirez still had this cash in September 2013, when the court ordered him to turn over all of his assets to the receiver. That inference is also clearly supported by the record because the accountant testified that limited cash deposits were made into the checking accounts controlled by Ramirez. Indeed, the largest cash deposit made into the accounts was $50,000. Thus, the accountant could not trace the cash to deposits into Ramirez's bank accounts. The district court therefore could find by clear and convincing evidence that Ramirez still had the cash (or at least had spent it on something that could be clawed back).[3]

Thus, the district court had ample evidence to support the turnover order, even under the clear and convincing evidence standard. Mandamus will not issue because it is not clear and indisputable that the district court erred in issuing the underlying order.

## B. The District Court Did Not Refuse to Strike the Affidavits

Ramirez's next argument is confusing because it is simply not based on reality. He claims that the district court refused to strike two affidavits, which

---

[3] At the evidentiary hearings, Ramirez's attorneys pointed out that the notes found in his office stated that the $500,000 had already been spent by the time Ms. Gonzalez requested her refund. They therefore argued that the cash must not have existed by the time of the receivership or turnover order. But the district court was entitled to disbelieve the note's statement that the cash had all been spent, given the accountant's inability to trace the cash to any bank account. Further, even if the cash had been spent, it could have been spent on assets that the receivership could claim, and therefore Ramirez's refusal to turn over that asset would still be a violation of the receivership order. Moreover, his refusal to account for the asset clearly violated his obligation to provide an accounting to the receiver.

it should have done because he was unable to cross-examine the affiants. But in fact Ramirez never moved to strike these affidavits. Indeed, Ramirez himself introduced these affidavits. The district court had not read one of the affidavits (FBI Agent LaBuz's affidavit) before Ramirez moved to admit it into evidence. And Ramirez's counsel conceded that FBI Agent LaBuz's affidavit did not mention the transaction with Ms. Gonzalez, which was the basis of the turnover order. Thus, this affidavit (introduced by Ramirez) was completely irrelevant to the matter at hand. Further, Ramirez's counsel accepted a stipulation as to the other affidavit (Cain's affidavit), agreeing not to defend against the government's motion to quash Cain's subpoena. Although these discrepancies were pointed out by the SEC's and the receiver's briefs, Ramirez's reply brief does not respond to these issues.

Overall, Ramirez's arguments regarding the affidavits are a puzzling red herring. Ramirez's counsel has patently misrepresented the situation to this court.

## C. Ramirez's Self-Incrimination Argument is Foreclosed by Supreme Court Precedent

Ramirez's last argument is that the contempt proceedings essentially punish him for asserting his Fifth Amendment privilege against self-incrimination. But he is not being punished for his refusal to answer questions; he is being punished for refusing to turn over $500,000, thereby violating the turnover order. A defendant in a contempt hearing bears the burden of production to show that he is presently unable to comply with the underlying order. *United States v. Rylander*, 460 U.S. 752, 757 (1983). He bears this burden even if he claims that his own testimony regarding inability to comply would incriminate him. *Id.* at 757–58.[4] Moreover, as the district

---

[4] Ramirez's attempts to distinguish *Rylander* are unpersuasive. He essentially tries to confine the case to its facts. For example, he argues that *Rylander* is distinguishable

court repeatedly noted, Ramirez did not need to testify to show that it would be impossible to turn over the $500,000; he could call other witnesses to testify as to how he spent the money.

## CONCLUSION

We DENY the petition for writ of mandamus. We GRANT Ramirez's and the receiver's motions to seal certain exhibits.

---

because it required the turnover of documents, not the production of testimony. But similarly, here, the turnover order requires the turnover of money, not the production of testimony. Ramirez also argues that *Rylander* is distinguishable because a criminal investigation is pending against Ramirez. But *Rylander* did not base its holding on the likelihood or unlikelihood of criminal charges. *See id.* Instead, its holding was broad. Just as in *Rylander*, "[t]he fact that [Ramirez's] refusal to come forward with [ ] evidence [of impossibility] was accompanied by a claim of Fifth Amendment privilege may be an adequate reason for the court not compelling him to respond to cross-examination at the contempt hearing, but the claim of privilege is not a substitute for relevant evidence." *Id.* at 761.