# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Decided October 22, 2019

No. 19-3054

IN RE: ROGER JASON STONE, JR., ET AL.,
PETITIONERS

———

On Petition For Writ of Mandamus
(1:19-cr-00018)

———

*Bruce Rogow* and *Robert C. Bushcel* were on the petition for writ of mandamus and the reply.

*Jessie K. Liu*, U.S. Attorney, *Elizabeth Trosman* and *David B. Goodhand*, Assistant U.S. Attorneys, and *Adam C. Jed*, Special Assistant U.S. Attorney, were on the opposition to the petition for a writ of mandamus.

Before: MILLETT, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Roger Stone and members of his family petition this Court for a writ of mandamus vacating the District Court's orders modifying Stone's conditions of release, arguing that the orders infringe on their First Amendment right to free speech. Where a mandamus petitioner has an adequate alternative remedy, however, we lack jurisdiction to grant the petition. *In re Asemani*, 455 F.3d

296, 299-301 (D.C. Cir. 2006) (dismissing mandamus petition for lack of jurisdiction). Here, because Stone and his family members failed to avail themselves of adequate alternative remedies, we dismiss their petition.

## I.

Roger Stone is a political consultant who has worked in U.S. politics for decades. During the 2016 presidential campaign, Stone served as an official for then-candidate Donald J. Trump's campaign. On January 24, 2019, a grand jury returned a seven-count indictment charging Stone with: one count of obstruction of proceedings, in violation of 18 U.S.C. §§ 1505 and 2; five counts of false statements, in violation of 18 U.S.C. §§ 1001(a)(2) and 2; and one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(1). The indictment, signed by Special Counsel Robert Mueller, alleges that Stone obstructed investigations by Congress and the FBI into foreign interference in the 2016 presidential election. Specifically, the indictment alleges that Stone tried to block inquiries into his communications with an organization that published files stolen by Russian hackers from the Democratic National Committee's computer system. Federal agents arrested Stone, and Stone pleaded not guilty to the charges on January 29, 2019. He was released on personal recognizance, subject to limited conditions, including travel restrictions and a prohibition on communicating with witnesses disclosed by the government.

During the initial status conference, the District Court explained that the case had received "considerable publicity, fueled in large part by extrajudicial statements of the defendant himself." A.41. As such, the Court advised the attorneys that it was considering issuing an order under Local Criminal Rule 57.7(c), which governs special orders restricting, among other

things, "extrajudicial statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a fair trial by an impartial jury." D.D.C. LCrR 57.7(c). The Court directed the parties to file submissions on the appropriate scope of such an order.

On February 15, 2019, after receiving input from the parties, the Court entered the Rule 57.7(c) order. In its order, the Court explained its obligation to prevent improper influence on the jury pool and the possibility that "public pronouncements" may "inflame" the large and "vociferous[]" crowds that had been attending the proceedings. A.52. To that end, the Court first ordered that "Counsel for the parties and the witnesses must refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case." A.53. This part of the order applied only to the attorneys. The second part of the order applied to all participants in the case, but it applied only to statements made in or around the courthouse:

> [A]ll interested participants in the matter, including the parties, any potential witnesses, and counsel for the parties and the witnesses, must refrain, when they are entering or exiting the courthouse, or they are within the immediate vicinity of the courthouse, from making statements to the media or to the public that pose a substantial likelihood of material prejudice to this case or are intended to influence any juror, potential juror, judge, witness or court officer or interfere with the administration of justice.

A.53-54. The order imposed no conditions on Stone's public remarks beyond the immediate vicinity of the courthouse, but

clarified that the order "may be amended . . . if necessary." A.54. The order also advised that, in deciding whether to grant "any future request for relief based on pretrial publicity," the Court would consider "the extent to which the publicity was engendered by the defendant himself." *Id.*

Three days later, on February 18, 2019, Stone posted an image on his Instagram account depicting the District Court judge in this case with crosshairs next to her head, alongside inflammatory commentary in which he accused her of bias. That same day, he removed the post and filed a "Notice of Apology," apologizing to the Court for "the improper photograph and comment posted on Instagram today." A.55. Stone himself signed the filing, but later admitted that he did not write it and had "signed it on the advice of counsel." A.57, 75. Even after taking the post down, however, Stone did a media interview later the same day in which he continued to accuse the judge of bias. The day after the post went up and came down, the District Court ordered Stone to show cause why its February 15, 2019 order and/or Stone's conditions of release should not be modified or revoked in light of his Instagram post, and set a hearing on the matter for February 21, 2019.

At the hearing, Stone apologized directly to the Court, recognizing that he had "abused the latitude" the Court gave him and blaming his "stupid lapse of judgment" on "emotional stress." A.69, 87. Stone stated he could "offer no excuse for [the post]." A.69. When the Court asked Stone whether he understood "that the posting could be viewed as a threat to the Court," Stone replied, "I now realize that. That was not my intention." A.70. Stone explained that he believed that the crosshairs were actually a "Celtic cross" or a "Celtic occult symbol," the same explanation he had provided to media reporters shortly after posting the image. A.70, 74, 85. Stone

also testified that, while he posted the image, he "did not select the image." A.69, 77-78. According to Stone, one of the "five or six" people who "volunteer" for him selected the image, and Stone decided to post it. A.78-79, 88. However, when pressed for the name of this volunteer, Stone could not remember who had sent him the image.

At the conclusion of the hearing, the Court declared that it "d[id] not find any of [Stone's] evolving and contradictory explanations credible" and that Stone had made "deliberate choices" to "express himself in a manner that can incite others who may feel less constrained," which "posed a very real risk that others with extreme views and violent inclinations would be inflamed." A.102. In addition, the Court noted that its initial order imposed no restrictions on Stone's speech beyond the courthouse and that it took Stone just "three days" to abuse that trust. A.104-05. The Court found that Stone's post had "the effect and very likely the intent" to "denigrate th[e judicial] process and taint the jury pool." A.109. The Court further found that Stone's apology "r[ang] quite hollow," given that he "continued to adamantly defend the post, even after he took it down, thereby enhancing the risk that it would appeal to and stoke the passions of an angry crowd[.]" A.104.

Consistent with these findings, the Court decided to modify the conditions of Stone's pretrial release. Before doing so, it asked counsel for Stone how to "craft an order that [Stone] would find clear enough to follow[.]" A.98. Counsel for Stone suggested an order that Stone not "talk[] about this Court" or the special prosecutor and that he not "impugn[] the integrity of the Court" or the government. A.98-99.

The District Court modified the conditions of Stone's pretrial release in a minute order the same day:

[T]he conditions of defendant's pretrial release are hereby modified to include the condition that, and the February 15, 2019 media communications order is hereby modified to provide that, the defendant is prohibited from making statements to the media or in public settings about the Special Counsel's investigation or this case or any of the participants in the investigation or the case. The prohibition includes, but is not limited to, statements made about the case through the following means: radio broadcasts; interviews on television, on the radio, with print reporters, or on internet based media; press releases or press conferences; blogs or letters to the editor; and posts on Facebook, Twitter, Instagram, or any other form of social media. Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers.

A.107-08, 114-15 ("February 21, 2019 order").

The gist of the February 21, 2019 order was that, beyond soliciting funds for his legal defense or maintaining his general innocence, Stone was not to discuss the case in any way. As the District Court explained, Stone could "send out as many emails, Tweets, posts as [he] choose[s] that say, [']Please donate to the Roger Stone defense fund to help me defend myself against these charges[']" and could add that he is "innocent of the charges." A.108. The Court made clear, however, that Stone was permitted to speak publicly about "any other matter of public interest," so long as he refrained from

any specific discussion about the case or the people involved in it. *Id.* The Court declared that, under the Bail Reform Act, 18 U.S.C. § 3142(c)(1) and (3), and *Gentile v. State Bar of Nevada,* 501 U.S. 1030 (1991), these conditions were necessary and were the least restrictive means available to prevent "material prejudice to the case and the due administration of justice." A.105-09. The Court also advised Stone that "any violation of this order will be a basis for revoking [his] bond and detaining [him] pending trial." A.109.

Neither Stone nor any of his family members challenged the February 21, 2019 order in the District Court in any way or sought direct review of it from this Court.

About four months later, the Court learned that Stone had violated the February 21, 2019 order in various ways. On June 20, 2019, the government moved for an order to show cause why the Court should not modify further the conditions of Stone's release, citing numerous examples of Stone's communications it believed violated the February 21, 2019 order. These communications include, among others, an Instagram post on March 3, 2019, with the title "who framed Roger Stone," A.125, 192-93; an Instagram post on April 4, 2019 featuring a headline about Stone's arrest, with commentary from Stone asking what "could [the FBI] possibly be hiding," A153 n.1, 162; an Instagram post on May 16, 2019 stating that Stone had "challenged the entire 'Russians hacked the DNC/CrowdStrike' claim by the Special Counsel," A.153 n.1, 164; and a text message in late February from Stone to *Buzzfeed News* stating that – contrary to testimony before Congress by President Trump's former attorney Michael Cohen (a potential witness in the case against Stone) – Stone had not told then-candidate Trump about his communications with anyone seeking to interfere in the election on Trump's

behalf, *see* A190-92. The government did not ask the Court to hold Stone in contempt or to revoke his bond.

Stone responded to the motion, calling it a "disproportionate reaction" to his exercise of First Amendment rights and claiming that the government sought to "deprive [him] of the narrow latitude the Court left him[.]" A.170. Stone argued that the examples cited by the government either involved Stone's reposting articles or graphics originally produced by others, which did not constitute statements by Stone himself, or were mere "rhetorical question[s]" that were not "statements" about the case. A.170-75.

The District Court held argument on the motion at a hearing on July 16, 2019 and ultimately concluded that Stone had violated its clear instructions not to publicly discuss his case in any way. The Court found that "[i]t didn't take a week" after the February 21, 2019 order for Stone to contact a news outlet to "call[] a witness in this investigation a liar." A.218. The Court also found that, while some of the social media posts "were initially statements made by other people," Stone "posted and disseminated them himself again on his own Instagram feed, under his own name, to his own followers," thereby "spreading it with his imprimatur." A.220-21. Stone's "obvious purpose," the Court found, was "to gin up more public comment and controversy about the legitimacy of the Mueller investigation and the House investigation to get people to question the legitimacy of this prosecution." A.222. Based on these clear violations, the Court explained that it was "obvious" that Stone was either unable to "differentiate between the very broad range of speech" he was entitled to and speech that was prohibited under his conditions of release, or he was simply refusing to comply with them. A.223.

Because Stone had shown himself "unwilling to stop talking about the investigation" despite the Court having "twice given [him] the benefit of the doubt," the District Court recognized the need to "make the restriction even more clear so that it calls for no interpretation on [Stone's] part whatsoever." A.223-24. To avoid generating even "more pretrial publicity and more concerning articles for the jury to read," the Court deferred initiating contempt proceedings. A.222-23. The Court also declined to revoke Stone's bond. Instead, the Court again modified the conditions of Stone's release to include a blanket ban on using Instagram, Twitter, or Facebook. Specifically, the Court declared that during the pendency of the case, Stone is prohibited from posting "on Instagram, Twitter or Facebook in any way, on any subject," and that this ban "includes, but is not limited to, forwarding, liking, re-posting or re-Tweeting anyone else's posts or Tweets." A.224.

The next day, on July 17, 2019, the Court entered an order restating this modification and clarifying that "all other conditions of release, and all other provisions of the Court's orders of February 15 and February 21, 2019, remain in force." A.229-30. The order emphasized in bold the existing restrictions on Stone's discussion of the case through "any other form of social media" and "indirect" discussion of the case through "surrogates, family members, spokespersons, representatives, or volunteers." *Id*. The order also stated that such prohibited statements "include, but are not limited to, statements about public filings or orders issued in the case, and the re-transmission, quotation, or dissemination of statements by others about the investigation or the case." A.230.

On August 2, 2019, Stone and four of Stone's family members petitioned this Court for a writ of mandamus seeking to vacate the District Court's February 21, July 16, and July 17,

2019 orders modifying Stone's conditions of release and sought expedited review. The Petitioners argue that the orders constitute an unconstitutional prior restraint on their speech. Shortly after they filed the petition, an individual named David Christenson moved to intervene.

## II.

"[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980). To show entitlement to mandamus, a petitioner "must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (citation omitted). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Id.* (citation omitted). Because the Petitioners possess adequate alternative remedies, they fail to satisfy the third prong of mandamus entitlement, and we must dismiss the petition for lack of jurisdiction.

## A.

For his part, Stone could have appealed under 18 U.S.C. § 3145(c), which expressly provides for judicial review of a detention order. *See United States v. Salerno*, 481 U.S. 739, 752 (1987) ("The [Bail Reform] Act's review provisions, § 3145(c), provide for immediate appellate review of the detention decision."). Indeed, we recently heard a direct appeal by a criminal defendant from a pretrial order regarding his conditions of release – in that case, a pretrial detention order.

*See United States v. Manafort*, 897 F.3d 340 (D.C. Cir. 2018).[1] And despite Stone's protestation that "no adequate alternative remedy would suffice to expeditiously address the violation" he complains of, Pet'rs' Reply Br. at 10-11, this provision expressly requires expeditious review, stating that "[t]he appeal shall be determined promptly," 18 U.S.C § 3145(c).[2]

Stone could have challenged the conditional release orders by filing a notice of appeal within fourteen days after their entry, *see* FED. R. APP. P. 4(b)(1)(A), but failed to do so. Stone also could have filed a motion to modify his conditional release order and filed an appeal within fourteen days if unsuccessful. Instead, on August 2, 2019 – sixteen days after the July 17 order and over six months after the February 21 order – he filed the instant petition for writ of mandamus. Thus, even if we were to construe his petition as a notice of appeal, we would have to dismiss the appeal because the government argued that the petition, so construed, would be untimely. *See id.*; *United States v. Byfield*, 522 F.3d 400, 402-03 (D.C. Cir. 2008). Stone had an adequate avenue of relief – direct appeal – but he failed to avail himself of it in a timely fashion, so we lack jurisdiction

---

[1] *See* Appellant's Opening Br. at 2, *Manafort*, 897 F.3d 340 (No. 18-3037) (asserting 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291 as the basis for our jurisdiction).

[2] Though the technical basis for appealability of pretrial release orders has confounded scholars and divided courts, *see, e.g.*, 15B Charles A. Wright et al., *Federal Practice and Procedure* § 3918.2 at 440 (2d ed. 1992) (noting that "the incorporation of [28 U.S.C.] § 1291 [in 18 U.S.C. § 3145(c)] is potentially ambiguous"), we need not decide this question here. Whether a criminal defendant's appeal of his detention or release order is reviewable as a "final order" under 28 U.S.C § 1291, *see, e.g.*, *United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004), or as a "collateral order," *see, e.g.*, *United States v. Schock*, 891 F.3d 334, 339 (7th Cir. 2018), the end result is the same: an appealable order.

to grant the mandamus petition. *See United States v. Gundersen*, 978 F.2d 580, 583 (10th Cir. 1992) (conditional release order was an appealable order pursuant to 18 U.S.C. § 3145(c), and "[m]andamus, therefore, is inappropriate"); *In re Ojeda Rios*, 863 F.2d 202, 205 (2d Cir. 1988) (mandamus not available where appeal of pretrial detention order was still pending); *see also In re Robinson*, 713 F. App'x 764, 769 (10th Cir. 2017) (court denied mandamus petition as moot where appeal of detention order was also filed); *In re Williams*, 364 F. App'x 764, 765 (3d Cir. 2010) (pretrial detainee not entitled to mandamus relief when he could have appealed denial of his motion seeking review of detention order).

**B.**

Stone's family members, who assert a somewhat different injury than Stone, also fail to establish that no adequate alternative remedy exists. Unlike Stone himself, Stone's family members are free to use social media and free to speak about the case. The order merely enjoins Stone from vicariously expressing his speech about the case through anyone else. However, because the order expressly mentions his family members, they argue that it chills their speech rights in two ways. First, they contend that speaking about the case could put Stone's liberty at risk, because it could be "viewed as" speaking on his behalf. Petition at 27. Second, they fear that speaking about the case will "[a]t the least" subject them "to an inquiry by the court" as to whether they were acting as Stone's "surrogates." *Id.* (citing *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965)).

To the extent Stone's family members assert a right to make statements about the case completely independent from Stone, and not on his behalf, their complaints about the District Court's order appear somewhat exaggerated. Even if the

District Court's order did not contain the challenged provision prohibiting Stone from "comment[ing] publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers," A.107-08, 114-15, 229-30, Stone's family members would be in the same position they are now – that is, they would not be permitted to knowingly aid and abet Stone in contemptuously violating the Court's orders. *See* 18 U.S.C. § 2. Moreover, Stone cannot be automatically punished anytime one of his family members speaks about his criminal proceedings. Rather, the government would have the burden to establish such surrogacy by clear and convincing evidence. *See* 18 U.S.C. § 3148(b)(1)(B). Nevertheless, Stone's family members also possess an adequate appellate remedy to challenge the alleged First Amendment violations, depriving us of mandamus jurisdiction.

Though they lack the same appellate rights Stone has under 18 U.S.C. § 3145(c), our Circuit has long allowed nonparties subject to a restrictive order to appeal that order under the collateral order doctrine. Often, where a gag order restricts speech about a case, the nonparties challenging the order are members of the press. For example, in *In re Reporters Committee for Freedom of the Press*, we considered nonparty reporters' appeal of a protective order over discovery materials under the collateral order doctrine, because the reporters' claims were "separable from, and collateral to, the rights of the parties to the underlying proceeding." 773 F.2d 1325, 1330 (D.C. Cir. 1985). We explained that the order was a final, reviewable order as to the reporters because they asserted that it irreparably damaged their "right to [receive] the unprivileged information during trial, when it had greater news value," and because "appellate consideration of the reporters' claims would not disrupt the trial[.]" *Id.*; *see also Cable News Network, Inc. v. United States*, 824 F.2d 1046 (D.C. Cir. 1987)

(per curiam) (considering an appeal brought by nonparty news organization and reversing a district court's decision to close the courtroom during the voir dire portion of a criminal proceeding); *United States v. Brown*, 218 F.3d 415, 422 (5th Cir. 2000) ("[T]his Court and other Courts of Appeals have repeatedly held, in both civil and criminal trials, that gag orders imposed on members of the press are appealable under the collateral order doctrine." (collecting cases)).

For purposes of collateral-order appellate jurisdiction, we see no distinction between an appeal brought by nonparty relatives of a party who wish to speak publicly about a case and nonparty reporters who wish to receive information about a case. In both instances, the alleged injury is to First Amendment rights during the pendency of a case. And an aggrieved nonparty with Article III standing can appeal an order that affects her interests. *See In re Sealed Case (Med. Records)*, 381 F.3d 1205, 1211 n.4 (D.C. Cir. 2004) ("The Supreme Court has never restricted the right to appeal to named parties to a litigation, and if the decree affects a third party's interests, he is often allowed to appeal." (citation and internal quotation marks omitted)).

In short, we hold that mandamus is not available for Stone's family members, because they may move the District Court to reconsider or modify the conditions of release and, if unsuccessful, appeal the denial of that motion.[3] As we

---

[3] Because they filed their petition more than fourteen days after the entry of the July 17, 2019 order, we cannot construe Stone's family members' motion as a notice of appeal. *See* FED. R. APP. P. 4(b)(1)(A). We therefore do not decide whether they could have directly appealed the conditional release orders without first presenting their objections to the District Court. Suffice it to say that they have an adequate alternative remedy: a motion for reconsideration and, if necessary, an appeal of the denial of that

explained in *United States v. Hubbard*, "[t]he means by which third parties have sought to assert their interests in criminal cases have been manifold," but generally "[i]t is the trial court and not this court that should engage in the initial consideration of the interests at stake[.]" 650 F.2d 293, 309-10 (D.C. Cir. 1980) ("Even assuming mandamus relief is available to non-parties in a criminal proceeding, we think the inevitable delay in seeking a writ and the narrow circumstances under which it will be granted render it inadequate to redress the type of injury here alleged and mandate the identification of some other means by which a non-party's interest may timely be presented to the district court whose actions are alleged to affect that interest."); *see also United States v. Barry*, No. 90-3149, 1990 WL 104925, at *1 (D.C. Cir. July 5, 1990) (remanding an appeal by nonparties of an order banning them from attending a criminal trial and holding that they did not

motion. *See In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985) (denying writ of mandamus "because the petitioners had a clearly adequate remedy in that they could have petitioned for review of the [agency's] order . . . and could then have moved for a stay of that order"); *Cole v. U.S. Dist. Court For Dist. of Idaho*, 366 F.3d 813, 815 (9th Cir. 2004) ("[B]ecause mandamus is an extraordinary remedy and petitioners did not take advantage of an available remedy by seeking review of the magistrate judge's decision before the district court, we deny the petition."); *In re Ramirez*, 605 F. App'x 361, 363 (5th Cir. 2015) (explaining that the circuit court had previously denied a mandamus petitioner's petition "because a motion for reconsideration was still pending with the district court, meaning that an alternative means for relief was still available"); *In re Ingris*, 601 F. App'x 71, 75 (3d Cir. 2015) (denying mandamus petition seeking to correct an alleged docketing error because "recourse [could] be had either by writing a letter to the Clerk of the District Court seeking reconsideration of the decision, or by appealing the decision of the Clerk to a United States District Judge . . . in accordance with whatever local rules or internal operating procedures might apply").

need to "seek to intervene in the criminal proceeding in order to note an appeal," and that "the most appropriate course" was "to require [them] to present their First and Fifth Amendment claims to the district court in the first instance"); *Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 198 (D.C. Cir. 2002) ("We are particularly disinclined to issue the writ before the district court has acted[.]").  Though the availability of a motion to reconsider will not preclude mandamus jurisdiction where a petitioner shows that such a motion would be futile, *see In re BigCommerce, Inc.*, 890 F.3d 978, 982 (Fed. Cir. 2018), Stone's family members give us no reason to believe that the District Court would not fairly consider their objections.  Because Stone's family members fail to meet their burden to establish the lack of any adequate alternative remedy, we lack jurisdiction over their mandamus petition.  *See Am. Hosp. Ass'n*, 812 F.3d at 189.

## III.

Consistent with the foregoing, we dismiss the mandamus petition and deny the motion to intervene as moot.

*So ordered.*